Hocker, et al. vs. Gentry, et al.

CASE 19—IN EQUITY—JUNE 15.

# Hocker, et al. vs. Gentry, et al.

APPEAL FROM MADISON CIRCUIT COURT.

3me 463
120   268

3me 463
135   821

Where the consideration of a contract is that the obligee therein signs the name of another to an instrument without authority, such contract will not be enforced either in favor of the obligee or his donee.

A final order cannot, after the term at which it was rendered, be vacated by the court below, except in the mode prescribed by the Civil Code, *sections* 373, 580, *or* 581, nor for any cause except one of those mentioned in *section* 369 *or* 579.

Where a purchaser of slaves at a public sale, made by a trustee under deed of trust of an insolvent debtor, left them in possession of the debtor, and, after his death they remained in possession of his widow and children—the long continued possession, the acts and declarations of the party in possession, and of the purchaser concerning their ownership, &c., *held* sufficient to show that the slaves do not belong to the purchaser, who asserts claim to them, but to the heirs of the decedent. See opinion for the facts.

When a legacy is given to a class of persons, all take who answer the description at the time it vests. This is not prevented by the fact that the payment or distribution of the legacy is postponed to a future day. In such cases, if one of the class dies before the time for possession or distribution, his interest goes to his representatives.

If a legacy is given to a class of persons to be paid to them, or to be divided between them, when one shall attain a certain age, or at any other definite future time, they take a vested interest immediately after the testator's death, the presumption being that he intended to annex the time to the payment or distribution, and not to the gift; and this presumption is strengthened if he directs the intermediate use or profits to be applied for their maintenance. On the other hand, if the will gives the property, its use or profits, to persons other than the ulterior legatees, or for other purposes than their benefit, until one of them shall attain a certain age, and the property or its proceeds is directed to be divided between or paid to them at the end of that period, it is of the nature of a remainder, and they take an immediate vested interest, the presumption being that the testator postponed the distribution or payment for the purposes of the prior bequest, and not to prevent the ulterior legacy from vesting.

These rules do not prevail, if the will contains any provision showing the testator's intention to postpone the vesting of the legacy.

If the direction to the executor to sell land or slaves is positive, the right of the legatee will in equity be regarded as a right to money from the time of the testator's death, though the period of sale is remote and the conversion cannot be made till the time arrives.

A will contained the following provision: "I also devise to the children of my said son, Thos. J. Gentry, the following slaves, (naming them.) These slaves and their increase I direct my executor to hire out until the youngest of said children attains the age of 21 years; then I direct my executor to sell all of said slaves, and divide the proceeds equally among said children." There were four legatees. One of them,

a *feme*, married after the death of the testator, and died before the youngest child attained the age of 21 years. *Held*—that the legatees took a vested interest in the proceeds of said slaves, which, in equity, must be regarded as a right to money from the time of the testator's death; and that the husband of the one who died is entitled, in her right, to one-fourth of said proceeds. The division to take place at the time mentioned in the will, under which they are also entitled to the hire of the slaves.

Formerly a sale by a testator, after making his will, of land thereby devised, was a revocation of the devise; and a sale by him, after making his will, of a chattel thereby bequeathed, was an ademption of the legacy; and no proof was admitted as to his intention in making the sale. These rules have been changed, both as to devises and bequests to an heir of the testator, and the burthen rests on those claiming against the will to show that the testator, in selling the property, intended to adeem the legacy or devise. (*Rev. Statutes, chapter* 46, *article* 3.)

Though the statute of frauds only speaks of contracts for the sale of land, contracts by which one agrees to buy land for another are equally within its operation.

Although the statute of frauds be not pleaded, if the answer deny the making of any agreement, it has the same effect.

No judgment can be given on a verbal contract embraced by the statute of frauds even if no defense is made. Where the petition merely alleges "an agreement," without saying it was in writing, and without exhibiting any writing, it shows that it was a verbal agreement.

If a man, in violation of a verbal agreement with his wife, should purchase land in his own name, with effects belonging to her, a trust would result to her. (*Rev. Stat., chap.* 80, *sec.* 22.) But where the land was paid for by him with money derived from the sale of her slaves which they had sold and conveyed, the notes having been taken payable to him and collected by him, and the conveyance of the slaves made no provision as to who should own the proceeds—the money was his, and no trust resulted to her. (*Rev. Stat., chap.* 47, *art.* 2, *sec.* 2.)

The husband, surviving the wife, is not entitled to her slaves which she owned at the time of her marriage, but only to a life estate therein. (14 *B. Mon.*, 304; *Rev. Stat., chap.* 47, *art.* 4, *sec.* 2.)

Squire Turner, for appellants, cited *Rev. Statutes, article* 3, *page* 383.

W. H. & J. W. Caperton, and C. F. Burnam, for appellees.

JUDGE BULLITT DELIVERED THE OPINION OF THE COURT:

In the court below several suits, brought by Wm. K. Hocker and others against Martin Gentry and others, were consolidated and heard together. Hocker, Kelly and Oldham appealed from the judgment. The record does not contain Oldham's petition, nor otherwise show that he has been prejudiced. The appeal of Hocker and Kelly presents several questions.

1. In the case of Josiah Gentry against W. K. Hocker and others it appears that Curran Gentry being indebted to Hocker, and having a claim to some money in Virginia, verbally authorized

Hocker to collect said money and apply it to his demands on Curran Gentry. Some months afterward Hocker, having reason to believe that some money was in the hands of one Brown, in Virginia, for Curran Gentry, applied to Martin Gentry to aid him in getting possession of it. Curran Gentry being absent, and Hocker having no written evidence of his right to receive the money, Martin Gentry signed Curran Gentry's name to a paper authorizing Hocker to receive said money, and in consideration thereof Hocker executed the following instrument: "This is to certify that I have this day sent to Virginia for some money due Curran Gentry. If I get it I am to give one half of it to Martin Gentry, and to hold the balance till all my claims against said C. Gentry are satisfied. This March 17th, 1858.                               WM. K. HOCKER."

Soon afterward Hocker received from Virginia $312, half of which he paid to Martin Gentry, and in July, 1858, he received an additional sum of $304, which he refused to divide with Martin Gentry. Josiah Gentry, to whom Martin Gentry gave the claim, sued Hocker for half of said $304, and obtained a judgment therefor, from which Hocker appealed.

2. In the case of Martin Gentry against Hocker and others the following facts appear:

In February, 1857, Curran Gentry mortgaged to Martin Gentry a tract of land purchased from one Hamilton, and his interest in four negro men, to secure certain debts due to Martin Gentry.

On the 15th and 16th March, 1858, an attachment in favor of Hocker was levied on said land and slaves and other property, to satisfy demands held by him on Curran Gentry.

On the 16th March, 1858, Martin Gentry filed a petition setting up certain demands against Curran Gentry, and obtained a general order of attachment, which was levied after Hocker's; his petition did not refer to said mortgage nor to the debts secured thereby.

In May, 1858, the court made an order consolidating said suit of Martin Gentry with that of Hocker, and other suits brought about the same time; and in July, 1858, made an order appointing Martin Gentry and S. Turner, Jr., commission-

ers to sell said land and other attached property, and both acted under said order.

In September, 1858, Martin Gentry filed a petition in said cases, stating that he owned certain slaves, (*Jinsy* and her children,) that had been attached by Hocker and others as Curran Gentry's property, and praying to be made a defendant thereto; this petition did not refer to said mortgage nor to the slaves or land therein mentioned.

Afterward, in September, 1858, the court confirmed a report of sale made by said Turner and Martin Gentry, and ordered them to collect the proceeds of all sales made, and out of the proceeds of said land to pay first the balance due to Hamilton for purchase money, and to pay the residue, if any, to Hocker upon his claims against Curran Gentry, and the residue, if any, to Martin Gentry upon his claims against Curran Gentry.

In November, 1858, Martin Gentry, having been made a defendant in said cases, filed an answer claiming *Jinsy* and her children as his property, but saying nothing about his aforesaid mortgage.

But in January, 1859, he filed an amended answer and cross-petition, setting up said mortgage, claiming priority over Hocker to the proceeds of said land, alleging that the aforesaid order in favor of Hocker was erroneous and obtained through fraud or mistake, and praying that it be set aside; and in March, 1860, the court rendered a judgment that said order in favor of Hocker be set aside, and giving Martin Gentry a prior lien on said fund. From this judgment Hocker appealed.

3. In the cases of Curran Gentry and others against Kelly and others, and of Kelly against Martin Gentry and others, the following facts appear:

(1.) About the year 1842, T. J. Gentry, being insolvent, and having conveyed his property to a trustee, the trustee made a public sale thereof, at which Martin Gentry purchased a slave called *Jinsy* and her child. She now has four children living. She and her children remained in the possession of T. J. Gentry for several years, and until his death, and then continued in possession of his widow until her death in 1850—T. J. Gentry and his widow residing upon land which he had

formerly owned, and which he had conveyed to Martin Gentry, his brother.

T. J. Gentry left four children, viz: Josiah, Curran, Thomas, and Ann. Being infants when their mother died Martin Gentry became their guardian, and took them to his house, and also took charge of said slaves, *Jinsy* and her children, and controlled them about four years, when, with his consent, Curran Gentry, then nearly 21 years of age, took possession of them, and they remained in his possession until they were attached by Hocker and other of his creditors in 1858.

Martin Gentry also obtained an attachment for debts due to himself and others, (whose claims were transferred to him for the purpose of uniting in one action,) against Curran Gentry's property, and caused it to be levied on said slaves in March, 1858, but in September, 1858, as previously stated, he filed a cross-petition claiming said slaves as his own property, under his aforesaid purchase from T. J. Gentry's trustee.

James Kelly, having married the said Ann Gentry, who died in 1857, without issue, filed a cross-petition, claiming one-fourth of said slaves as husband and administrator of said Ann.

The circuit judge decided that said slaves are the property of Martin Gentry, from which Hocker and Kelly appealed.

(2.) In 1855 Josiah Gentry, the grand-father of the aforesaid Josiah, Curran, Thomas and Ann Gentry, died, leaving a will which contains the following provision for them: "I devise to the children of my deceased son, Thos. J. Gentry, my tract of land in Madison county, known as the Walnut Level farm. This farm I direct shall be kept, used, and cultivated for the maintenance and support of said children, until the youngest attains the age of 21 years; then said land is to be sold and the proceeds equally divided among said children—said sale to be made by my executor. I also devise to the children of my said son, Thos. J. Gentry, the following slaves, to-wit: Dean, Abram, Henderson, Daniel, Emily, and Wiley. These slaves and their increase I direct my executor to hire out until the youngest of said children attains the age of 21 years; then I direct my executor to sell all of said slaves and divide the proceeds equally among said children."

James Kelly married said Ann Gentry after the testator's death. All of said children except her are living. She died before the youngest child attained the age of 21 years. The youngest child attained that age in April, 1858, after which Martin Gentry, the executor, sold four of said slaves as directed by the will. Kelly, in right of his wife, claimed one-fourth of the proceeds thereof. Mrs. Kelly's brothers contended that, as she died before the youngest child attained the age of 21 years, they were entitled to said proceeds under the will; and the circuit judge so decided, from which Kelly appealed.

(3.) One of said devised slaves died before the testator, and he sold another of them, *Daniel*, for $900. Kelly, in right of his wife, claimed one-fourth of said $900, whilst the executor contended that the sale of *Daniel* was an ademption of so much of the legacy. The court below did not decide this point.

(4.) Kelly and wife sold her interest in the "Walnut Level farm" to Martin Gentry for a slave called *Amanda* and her child, and $200 in cash, and the slaves appear to have been conveyed by Martin Gentry to Mrs. Kelly.

In February, 1857, Kelly contracted with one Prewitt for 33⅓ acres of land, and took a bond for a conveyance to himself upon the payment of the purchase money, viz: $900, of which $400 were to be paid in April, 1857, and the residue in twelve months thereafter. Some time after said contract was made Kelly and his wife sold *Amanda* and her child for $1,250 on a credit, and the notes therefor were made payable to Kelly. The proof tends strongly to show that this sale was made in order to pay for said 33⅓ acres of land, and that it was paid for out of said $1,250.

After Mrs. Kelly's death, and pending this suit, Kelly made the last payment to Prewitt, and he conveyed the land to Kelly. Mrs. Kelly never had any issue born alive. Her brothers claimed said land as her heirs, and the circuit judge decided that Kelly holds it in trust for them, from which he appealed.

(5.) Mrs. Kelly, at the time of her marriage, owned a slave called *Eliza* and her child, which Kelly claimed as surviving husband. The circuit judge decided that he is entitled to a life estate only in said slaves, from which he appealed.

The foregoing facts present several questions.

1. Hocker refused to divide the second installment of money received from Virginia with Martin Gentry, upon the alleged grounds that it was not *due* at the time of the aforesaid contract between him and Martin Gentry, and that said contract only applied to money then *due*. We need not decide either of those questions. The paper authorizing Hocker to draw the money in Virginia does not appear to have been signed by Martin Gentry as attorney for Curran Gentry. He appears to have placed Curran's name to it as if it had been signed by Curran himself—his and Hocker's object being to lead the parties in Virginia, who held the money, to believe that it had been signed by Curran. In doing so he assumed a responsibility from which Hocker shrank, and this was the consideration for Hocker's contract to give him half of the money. It does not appear that Martin Gentry was authorized to sign Curran Gentry's name in that manner or otherwise. The law cannot favor such dealings by men with others' names. The act was illegal. The contract ought not to be enforced in favor of Martin Gentry, nor in favor of his donee, Josiah Gentry. The judgment enforcing it is erroneous.

2. The order made in September, 1858, directing the proceeds of the land purchased by Curran Gentry from Hamilton, to be paid to Hocker after paying Hamilton's claim, was a final order, which, after the term, could not be vacated by the court below, except in the mode prescribed by *section* 373, 580 or 581 of the Code, nor for any cause except one of those mentioned in *section* 369 or 579 of the Code. Even conceding that the mode of the proceeding to set aside said order was such as to authorize the court to act upon any of the grounds mentioned in *section* 369 or *section* 579, still it seems clear that the order should not have been vacated, because Martin Gentry failed to prove any unavoidable casualty or misfortune, preventing him from appearing and defending; any accident or surprise which ordinary prudence could not have guarded against; any misconduct or fraud on the part of Hocker in obtaining the order, or the existence of any other of the grounds mentioned in those sections. Martin Gentry was made a par-

ty to Hocker's suit in May, 1858, by the order of consolidation; and his petition to be made a defendant thereto, filed in September, 1858, shows that he had actual notice of Hocker's attachment, which had been levied on the property mortgaged to him, as well as on the slaves mentioned in said petition.

The judgment vacating said order in favor of Hocker is erroneous.

3. Kelly's appeal presents several questions:

(1.) As to the slaves *Jinsy* and her children.

As Curran Gentry's declarations concerning the ownership of said slaves were made whilst he was in possession of them with Martin Gentry's consent, they were competent evidence against the latter, and his exceptions to the proof thereof were properly overruled.

The fact that Martin Gentry caused an attachment in favor of himself and others against Curran Gentry to be levied on said slaves, is not satisfactorily explained by his attorney, who says that, when asked upon what property the attachment ought to be levied, he told Martin Gentry to have it levied on all the property that had been levied upon under Hocker's attachment, which had been issued the same day; because Martin Gentry did not follow his attorney's advice, but went with the deputy sheriff and, apparently, without knowing or inquiring what property had been levied on by another deputy under Hocker's attachment, he pointed out said slaves, and told the deputy to levy on them, saying that Curran Gentry had an interest in them. This seems irreconcilable with the idea that Martin Gentry then claimed or regarded these slaves as his own property; and, connecting this fact with the long continued possession of T. J. Gentry and his widow, the delivery of possession by Martin to Curran Gentry about the time the latter became of age; Martin Gentry's declarations as proved by Thomas Stagner; Curran Gentry's acts and declarations whilst in possession, as proved by several witnesses, and other corroborating proof, we feel forced to the conclusion, that these slaves do not belong to Martin Gentry, but were inherited from T. J. Gentry by his children.

Hocker, et al. vs. Gentry, et al.

The question whether Josiah and Thomas Gentry had sold their interest to Curran Gentry is not properly before us, and we will express no opinion upon it. There is no proof that Curran had purchased Mrs. Kelly's interest. Kelly, in right of his wife, is entitled to one-fourth of said slaves during his life. The judgment concerning them in favor of Martin Gentry is erroneous.

(2.) As to the proceeds of the four slaves sold by Josiah Gentry's executor, as directed by his will. The court below held that only such of T. J. Gentry's children as were alive, answering that description when the slaves were directed to be sold, took any interest in them, and that as Mrs. Kelly was then dead her husband took no interest in the sale-money.

Where a legacy is given to a class of persons, all take who answer the description at the time it vests. This is not prevented by the fact that the payment or distribution of the legacy is postponed to a future day. In such cases, if one of the class dies before the time for possession or distribution, his interest goes to his representatives. (2 *Jarman on Wills*, 54, *note* 1 ; 56 ; 70, 2*d Am. Ed.*)

The question is whether Mrs. Kelly had a vested or contingent interest.

If a legacy is given to a class of persons to be paid to them, or to be divided between them, when one shall attain a certain age, or at any other definite future time, they take a vested interest immediately after the testator's death, the presumption being that he intended to annex the time to the payment or distribution and not to the gift ; and this presumption is strengthened if he directs the intermediate use or profits to be applied for their maintenance. On the other hand, if the will gives the property, its use or profits, to persons other than the ulterior legatees, or for other purposes than their benefit, until one of them shall attain a certain age, and the property or its proceeds is directed to be divided between or paid to them at the end of that period, it is of the nature of a remainder, and they take an immediate vested interest, the presumption being that the testator postponed the distribution or payment for the

purposes of the prior bequest, and not to prevent the ulterior legacy from vesting.   (1 *Roper on Legacies, ch.* 10.)

Josiah Gentry's will directed the executor to hire out the slaves until the youngest child should attain the age of 21 years, without saying what should be done with the hire.   If he intended to raise a fund to pay debts, or for the general benefit of his estate, then, according to one of the above mentioned rules, the bequest to said children was of the nature of a remainder, and gave them a vested interest.   But in view of the sentence of the will immediately preceding those directions, viz: "I devise to the children of my deceased son, Thomas J. Gentry, the following slaves," &c., our opinion is, that he meant to give them the benefit of the hire until the youngest should become of age.  Thus construed, the will, in effect, gave the proceeds of said slaves to said children, to be equally divided between them when the youngest should attain the age of 21 years, and in the meantime gave them the benefit of the hire; and hence, according to the other of the above mentioned rules, Mrs. Kelly took a vested interest.

Of course these rules do not prevail, if the will contains any provision showing the testator's intention to postpone the vesting of the legacy.   Josiah Gentry's will has no such provision.

As Mrs. Kelly died before the time arrived for selling the slaves, as directed by the will, the question arises, whether her right is to be regarded as a right to the slaves or to their proceeds.

In *Christler's ex'r. vs. Meddis' adm'r.*, (6 *B. Mon.*, 37,) this court said: "Real estate is converted into personalty immediately on the death of the testator, only where the direction to sell is positive, without limitation as to time, and without discretion on the part of those to whom the power to sell is delegated." There the will gave a *discretionary* power of sale to the executors, and the decision that this did not in equity convert the land into money was in accordance with a well settled doctrine.   The question presented here did not arise, and consequently was not decided in that case.

It has been frequently decided, and may we think be regarded as settled, that, if the direction to sell is positive, the right of the legatee will in equity be regarded as a right to money from the time of the testator's death, though the period of sale is remote, and the converson cannot be made till the time arrives. (*Burnside's adm'r. vs. Wall*, 9 *B. Mon.*, 322; *Rhinehart and wife vs. Harrison's ex'r.*, *Baldwin's R.*, 177; *Marsh vs. Wheeler*, 2 *Edw. Ch. R.*, 156; *Fairlie vs. Kline*, 2 *Pennington's R.*, 754; *Byrne vs. Stewart*, 3 *Desau.*, 135.) The same doctrine applies to slaves.

As Mrs. Kelly, in common with her brothers, had a vested interest in the proceeds of said slaves, which in equity must be regarded as a right to money, from the time of the testator's death, it follows that Kelly, in her right, is entitled to one-fourth of said proceeds, and that the judgment in bar of his right thereto is erroneous.

(3.) Our view of the question just discussed makes it necessary for us to consider whether or not the sale of *Daniel* by the testator was an ademption of so much of the legacy to T. J. Gentry's children.

Formerly a sale by a testator, after making his will, of land thereby devised, was a revocation of the devise; and a sale by him, after making his will, of a chattel thereby bequeathed, was an ademption of the legacy. No proof was admitted as to his intention in making the sale. It seems clear not only that these rules have been changed, both as to devises and bequests to an heir of the testator, but that the burthen rests on those claiming against the will to show that the testator, in selling the property, intended to adeem the legacy or devise. (*Rev. Statutes, chap.* 46, *art.* 3.)

T. J. Gentry's children were heirs of the testator. Neither the will nor any proof in the case shows that in selling *Daniel* he intended to adeem so much of the legacy. Kelly has the same interest in the purchase money of *Daniel* as if he had been sold by the executor with the other slaves, and the circuit judge erred in not giving him a judgment for one-forth thereof.

(4.) As to the 33⅓ acres of land purchased by Kelly from Prewitt.

There is no proof of any written agreement on the part of Kelly to purchase this land for his wife. If he made a verbal agreement to that effect he is not bound by it. Though the statute of frauds only speaks of contracts for the sale of land, contracts by which one agrees to buy land for another are equally within its operation. (*Parker's heirs vs. Bodley*, 4 *Bibb*, 102; *Griffin and wife vs. Coffey, &c.*, 9 *B. Mon.*, 452; *Story's Eq. Jur., sec.* 1201, *a.*) Kelly did not plead the statute of frauds, but it was not necessary that he should for two reasons: 1st. He denied the making of any agreement, which, under the old practice, had the same effect as pleading the statute. (*Fowler vs. Lewis*, 3 *Mar.*, 445; *Brown &c. vs. East*, 5 *Monroe*, 408.) 2d. The petition of the heirs shows it was a verbal agreement they relied on, because they merely alleged "an agreement" without saying it was in writing, and without exhibiting any writing; and under the Code no judgment can be given on a verbal contract embraced by the statute of frauds even if no defense is made. (*Smith vs. Fah*, 15 *B. Mon.*, 443.)

Nor did any trust result to Mrs. Kelly or her heirs from Kelly's purchase of the land. Under the Revised Statutes, where a deed is made to one, and the consideration is paid by another, no trust results to the latter, (*ch.* 80, *sec.* 20,) except in "cases where the grantee shall have taken the deed in his own name, without the consent of the person paying the consideration, or where the grantee, in violation of some trust, shall have purchased the land deeded with the effects of such person." (*Ib.*, section 22.)

If a man, in violation of a verbal agreement with his wife, should purchase land in his own name, with effects belonging to her, the case no doubt would come within the first exception just cited. But the case before us does not, for two reasons: *First.* There is no satisfactory proof as to the alleged understanding between Kelly and his wife. The exceptions to the proof of Mrs. Kelly's declarations, made when her husband was not present, were properly sustained by the court below. From other proof it seems probable, though not certain, that it was understood between her and Kelly that the land, when paid for, should be so conveyed as to secure her a home

for life.   But whether it was to be conveyed to her for her separate use, (which would have enabled her to devise it,) or in the ordinary mode, in fee or for life, or to her and Kelly during their joint lives, and then to the survivor, does not appear. Some of these modes of fixing the title would have been far more favorable to Kelly than others, whilst either might have enabled his wife to secure a home for life, which seems to have been her object.   The record furnishes no reason for the belief that she wished to secure said land for her heirs to the exclusion of her husband.

*Second.* It may be conceded that the land was paid for by Kelly with money derived from the sale of *Amanda* and her child, and that said slaves were the property of Mrs. Kelly, and yet our opinion would be that no trust resulted to her.

"Husband and wife may sell and convey her chattel real or slave, in the same mode as the land of the wife may be sold and conveyed ; *and the proceeds shall be his, unless otherwise expressly provided in the conveyance or the obligation of the purchaser.*" (*Rev. Stat., ch.* 47, *art.* 2, *sec.* 2.)

The proof shows, that the purchaser of the slaves gave his notes for the purchase money, payable to Kelly, and it does not appear that the conveyance of the slaves made any provision as to who should own the proceeds.   The proceeds, therefore, belonged to Kelly, and his payment for the land therewith gave no resulting trust to his wife.

What would have been the effect of a written agreement between Kelly and his wife, that the proceeds should be used in buying land for her, need not be decided, as no such agreement appears to have been made.

The circuit judge erred in adjudging that Kelly holds said land in trust for Mrs. Kelly's heirs.

(5.) The judgment of the circuit judge, that Kelly holds a life estate, and only a life estate, in the slaves *Eliza* and her child, which Mrs. Kelly owned at the time of her marriage, is clearly right.   (*Hart &c. vs. Soward,* 14 *B. Mon.,* 304 ; *Rev. Stat., ch.* 47, *art.* 4, *sec.* 2.)

The judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.