NATHANIEL M. JEWETT & another *vs.* JAMES TUCKER
& others.

Suffolk.     March 16. — June 25, 1885.     W. ALLEN, COLBURN, & HOLMES, JJ., absent.

R., the agent of T., the owner of a lot of land, made an arrangement with N. to buy the land, but at no definitely fixed price. N. entered into a contract with a builder to erect a block of houses, for which he was to be paid in instalments, partly in cash and partly in promissory notes guaranteed by R. After the houses were partially completed, to enable T. to get the benefit of the improvements placed upon the land, T., with knowledge that N. was insolvent, executed a deed of the land to N. at a price more than twice its real value without the improvements, and N. made a mortgage of the same back to T., to secure his promissory note for a sum of money much greater than the value of the land without the improvements. The note was payable at a fixed time. It was also

under seal, and referred to the mortgage. The mortgage gave N. the right to pay the debt in instalments from time to time. T. subsequently, and before the maturity of the note, assigned the mortgage and note to trustees, in trust to pay certain unsecured creditors, and to pay over the surplus to him. Subsequently these creditors, by an instrument to which T. was not a party, agreed with the trustees to extend the time of payment of their claims. *Held*, on a bill in equity by the assignees in insolvency of N. against T. and his trustees, that the assignees were entitled to redeem the land from the mortgage on payment of its value without the improvements; and that the trustees did not stand in the position of *bona fide* purchasers for a valuable consideration. *Held, also*, that the creditors were not necessary parties to the bill. *Held, also*, that the court would not act on a suggestion, made for the first time in this court, that R. should be made a party, it not appearing that the rights of the plaintiffs as against the defendants could not otherwise be determined.

BILL IN EQUITY, filed January 23, 1884, by the assignees in insolvency of the estate of Frank O. Nash, against James Tucker, Isaac Fenno, and Nathaniel Tucker, for the cancellation of a mortgage of land given by Nash to Nathaniel Tucker, or to redeem the land from the mortgage, and, meanwhile, to restrain the sale of the land under a power of sale contained in the mortgage.

The case was heard, on the pleadings and evidence, before C. Allen, J., who found the following facts to be proved:

" Nathaniel Tucker was the owner of a tract of land in Dorchester, containing about one hundred thousand feet, and his son-in-law, T. M. Rhodes, was his business manager and agent in relation to this and other property. Early in 1883, Rhodes formed a plan for the improvement and disposal of this property in this manner. Nash, who before this time had taken a similar part in other transactions in land owned by Tucker, was to enter into a contract with one Blazo, a builder, by which Blazo was to build houses upon this land, and be paid in instalments from time to time, partly in cash, and partly in notes, the payments being guaranteed and the notes being indorsed by Rhodes; and, at some time later, Nash was to take a deed of the land from Tucker, and immediately mortgage the same back to Tucker to secure the whole of the nominal purchase money. In pursuance of this plan, the following things were done. On the 15th of March, 1883, Nash entered into a written contract with Blazo, the terms of which were fixed by Rhodes and Blazo, for the construction of six houses upon the land for the sum of thirty-three thousand dollars, payable from time to time as the work

went on, partly in cash and partly in notes, and Rhodes in writing agreed to guarantee the payments and to indorse the notes. The houses were to be finished by June 25, 1883. This contract was assigned by Blazo to the Glendon Company, and the work was proceeded with by Blazo and the Glendon Company, and payments were made from time to time by Rhodes furnishing money to Nash, who deposited it in his own name in bank and drew his own checks for the payments, and by notes signed by Nash and indorsed by Rhodes. Nash advanced no money of his own of any considerable amount under the contract.

" There was no distinct agreement between Rhodes and Nash as to the price at which the land should be called. Rhodes told Nash that Tucker's price was fifty cents a foot, but that perhaps it might be put at forty-seven and a half cents, or even at forty-five cents. There was no distinct agreement as to a division of any profits that might be made out of the transaction, or as to any compensation that Nash or Rhodes should receive; it was understood between Nash and Rhodes that Nash should act as a party to the contracts for the benefit of Rhodes and Tucker, and Nash was not expected to advance any money himself in carrying out the transaction, but the management and the profits were to be in the control of Rhodes, and Nash expected in some way to derive some profit or compensation from the transaction, though no distinct agreement upon the subject was made, and it was left to be determined by Rhodes how much, or to a subsequent agreement. Nash was engaged in a commission boot and shoe business as one of the firm of W. O. Nash & Co., had but slight means, was entirely unable to carry out the contract, and his want of means was well understood by Rhodes.

" Rhodes was himself heavily indebted and was insolvent, but was at the time in good credit, and was supposed by others to be amply responsible upon his contracts; but there was nothing to show that he sustained losses afterwards, or that he was himself ignorant of his financial condition; and accordingly I find that he was aware of it. The purpose of Rhodes was to give an inflated value to the land by means of an apparent sale to Nash at a fictitious price, to use Nash as an ostensible party to take the title and become responsible upon the building contract, to

avoid a direct liability of Tucker upon the building contract, and to secure to Tucker the benefit of the improvements upon the land. Tucker was absent at the West from October, 1882, till May, 1883, and had no direct communication with Nash upon these matters till July 3, 1883, at which time, knowing of what had been done, and sharing in the plan and purpose of Rhodes, he asked that the transaction should be completed by the execution of the deed and mortgage and mortgage note in respect to 86,494½ feet of the land, the remainder meanwhile having been sold to the city of Boston.

" There was a talk as to the price at which the land should be put, and Tucker at the outset insisted that it should be put at fifty cents a foot. Nash made some remonstrance, urging that, at that rate, there could be no profit upon a sale of the houses; and finally, on July 5, 1883, it was agreed that the price should be reckoned at fifty cents a foot; that no interest should be reckoned till July 1, 1883; that an indorsement of three hundred dollars should be made upon the note, and that the papers should be passed. Accordingly a deed was drawn up and executed from Tucker to Nash, dated March 15, 1883; a mortgage back from Nash to Tucker, reciting the consideration to be forty-three thousand two hundred and forty-seven $\frac{25}{100}$ dollars, and a note for that amount payable in five years, with interest semi-annually, guaranteed by Rhodes, and with an indorsement of interest paid to July 1, 1883, and of three hundred dollars on the principal, both mortgage and note being dated March 15, 1883; the deed and mortgage were acknowledged on the 5th of July, 1883, and put on record the same day.

" At this time considerable work had been done upon the houses, but they were not finished, and Nash was heavily indebted upon notes given by him and indorsed by Rhodes, in pursuance of the building contract, and was insolvent, and knew himself to be so, and Rhodes and Tucker knew or had reason to believe him to be so.

" The real value of that portion of the land which was conveyed to Nash, without the buildings, was about twenty thousand dollars, and this was understood by Rhodes and Tucker to be about the value of the land, and Nash's estimate of its value was not much higher.

"Nash was adjudged to be an insolvent debtor on December 19, 1883, and among his creditors are the holders of the notes given under the building contract; and the plaintiffs were duly chosen assignees.

"Rhodes was adjudged to be an insolvent debtor on November 9, 1883.

"Tucker assigned Nash's note and mortgage, with other property, on September 28, 1883, to the defendants James Tucker and Isaac Fenno, in trust for the benefit of his creditors."

Upon these facts, the judge ordered that a decree be entered "that an injunction issue enjoining and commanding said James Tucker and Isaac Fenno, their agents, attorneys, and counsellors, and each and every of them, to desist and refrain from disposing of said mortgage given by said Nash to said Nathaniel Tucker, dated March 15, 1883, and assigned to said James Tucker and Isaac Fenno, upon land in Boston, and from selling and foreclosing the same under the power contained in said mortgage, until the further order of this court or some justice thereof; and that it be referred to          , one of the masters of this court, to take an account of what is due to the defendant Nathaniel Tucker for principal and interest on his said mortgage, assuming the principal to be the sum of twenty thousand dollars, which I find to be the amount justly due thereon as of March 15, 1883, with interest thereafter at the rate of six per cent per annum; and also to take an account of all sums of money laid out and expended by said Nathaniel Tucker, or on his behalf, for betterments and improvements on the premises in pursuance of any agreement or understanding with said Frank O. Nash, or for necessary repairs and lasting improvements on the premises since said fifteenth day of March, 1883; and also to take an account of the rents and profits of the said mortgaged premises received by the said Nathaniel Tucker, or any other person by his order or for his use, since said date, or which without his wilful default might have been received; and in case the master shall find that said Nathaniel Tucker, or any other person holding under him, has been in the occupation thereof, then the said master is to set a rent thereon and take the accounts accordingly; and to make a statement of account showing what on the whole, making such allowances of interest

as should be allowed on either side of the account, shall be found to be due to the said defendant Nathaniel Tucker, as secured by said mortgage. And what upon the balance of the said account shall be certified due to the said defendant Nathaniel Tucker, with the costs of this suit, to be taxed by the clerk, it is ordered and decreed that the plaintiffs do pay unto the said defendants James Tucker and Isaac Fenno, with interest, within two calendar months after the said master shall have made his report, (or in case of exceptions thereto, then within two calendar months after said report shall be confirmed, or the amount due otherwise ascertained and decreed by this court,) at such place as the master shall appoint; and that thereupon all said defendants do resurrender, reconvey, and reassign the said mortgaged premises to the plaintiffs free and clear of all encumbrances due by them or any persons claiming by, from, or under them. But in default of the said plaintiffs' paying unto the said defendants James Tucker and Isaac Fenno what shall be so certified or decreed by this court as balance due upon the indebtedness secured by said mortgage, within such term and at such place as aforesaid, it is ordered that the said plaintiffs' bill do from thenceforth stand dismissed out of this court, with costs to be taxed by the clerk."

From this decree the defendants appealed to the full court.

After the case was entered in this court, an application was made that it be remitted to a single justice for a hearing on the question whether the beneficiaries named in the trust deed of September 28, 1883, ought not to be joined as defendants.

The case was thereupon remitted; and a hearing was had, before *C. Allen,* J., who ruled that it was not necessary, nor at this stage of the proceedings expedient, to join said beneficiaries as parties.

It was also orally suggested, at this hearing, that Rhodes or his representative ought to be joined as a party plaintiff. The judge stated that he did not consider that this question was before him.

In was further agreed, that on October 19, 1883, a paper was signed by certain creditors of Rhodes, by which they agreed with Tucker and Fenno, as trustees of Nathaniel Tucker, to extend the time of payment of the promissory notes of Rhodes

indorsed by Tucker, the securities which had been transferred to the trustees to be held by them to satisfy Nathaniel Tucker's indorsements on the notes of Rhodes.

It was further agreed, that the promissory note covered by the mortgage of Nash to Nathaniel Tucker was indorsed to the trustees at the time of the assignment to them.

*R. D. Smith & F. D. Allen*, for the assignees.

*W. Gaston*, (*C. L. B. Whitney* with him,) for Nathaniel Tucker.

*R. M. Morse, Jr. & G. W. Estabrook*, for the plaintiffs.

DEVENS, J.    After carefully examining the evidence upon which the case was heard before a single justice, we see no reason, so far as the facts are in dispute, to doubt the correctness of his findings, and we adopt them as our own.    There were certain matters not in dispute, such as the contents of written instruments, which are referred to, but not fully set forth, in the findings of fact.    These, so far as they are material, we shall refer to hereafter.

The bill proceeds, first, upon the ground that Nash, the insolvent, was indebted to Nathaniel Tucker on July 5, 1883, was then insolvent, and that the mortgage was made to Tucker in fraud of the insolvent laws, and as a preference, Tucker knowing or having reason to know the premises.    As the plaintiffs did not contend at the argument in this court that they were entitled to relief on this ground, it is unnecessary to consider it.

The bill also proceeds upon the ground that the mortgage was not void, but that there was something due upon it, prays for an account, and offers to pay what shall be found due.    The defendants contend that the assignees of Nash, who bring this bill for the benefit of his creditors, cannot avoid the mortgage debt in part and redeem the balance.    But even if the assignees might avoid the mortgage entirely, as having been fraudulently made to defeat the creditors of Nash and to secure to Tucker the benefit of improvements which had been placed upon the land with his fraudulent concurrence, the fact that they are content that the assignees of Tucker should receive the amount fairly due, according to its value, for the property which Tucker transferred in pursuance of the scheme, works the defendants no

injury. The assignees have only, upon this theory, failed to pursue their demand to its full extent, if the mortgage might be entirely avoided. It is found that the purpose of Rhodes, who was Tucker's agent, and who had previously carried through similar schemes for the disposition of Tucker's lands, was to give an inflated value to the land by means of an apparent sale of land at a fictitious price; that Nash was a person of small means; and that building contracts were made by Rhodes in the name of Nash, as an ostensible party, to avoid a direct liability by Tucker upon the building contract, and to secure to him the benefit of the improvements on the land. In this scheme Nash concurred, on a promise of a profit to himself, the amount of which was not fixed. It is further found that Tucker knew of what had been done, shared in the purpose and plans of Rhodes, and completed the transaction by the execution of the deed, receiving back the mortgage and mortgage note. The real value of the land was about $20,000 (while it was apparently sold for about $43,000) without regard to the value of the buildings, which were partially completed under the contracts made in the name of Nash. The defendants contend that, if Nash's assignees desire to set aside any portion of this transaction, they cannot keep its benefits and throw off its burdens; and therefore that the court will not hold Tucker to have made an effectual conveyance of the property to Nash, and yet reduce the mortgage below the contract price. But the contract price is found to have been grossly exaggerated, and an element in the scheme of fraud in which Nash, Rhodes, and Tucker participated. It was an apparent, and not a real contract. Whether Nash himself could or could not have availed himself of this fraud to reduce the nominal amount of the mortgage to the real value of the estate, or the sum he ought properly to pay, when his assignees, who represent the rights of his creditors, seek to redeem from the mortgage, all that they should be compelled to pay is the sum justly due from him. *Martin* v. *Root*, 17 Mass. 222, 228. *Gibbens* v. *Peeler*, 8 Pick. 254. Pub. Sts. *c.* 157, § 46. To require the land to be reconveyed to Tucker would but carry out the scheme, by putting into his possession the improvements placed on the land by Nash, which it was the purpose of the plan to secure to him.

The defendants concede that, if one has made an oral contract to convey his land at a fixed price, say at fifty cents a foot, and has permitted his proposed vendee, relying on the oral contract, to build on the property, a court of equity may, in certain cases, compel the owner to convey at the contract price; but contend that it will never compel him to convey at less than the contract price, even at what the property is worth, for that is making a man, perforce, sell his property without any profit, and depriving him of the benefit of his contract. This, the defendants submit, is what the decree appealed from does in effect. We have no occasion to controvert this proposition. It assumes that the price orally agreed on was honestly agreed on, and that there was no transaction in which the owner of the land participated by which the proposed purchaser was to place valuable improvements on the land, and secure to the owner the benefit of them by means of an artificial price, beyond the real value of the land, which is affixed thereto for this purpose. Whether in such case, if no conveyance had actually been made, a court of equity would compel the owner to convey at a fair price, or would seek in some other way to protect, as against the owner, those who had been induced to invest their money in improvements, need not be discussed. In the case at bar, the scheme has so far progressed that the proposed vendee has the title to the land; and, as against the vendor, who participated in it, the creditors of the vendee should be allowed to recover the value of the improvements. This can be done in no fairer way, where both parties are apparently insolvent, and the contest is between their respective creditors, than by allowing to the creditors of Tucker the fair original value of the land, while those of Nash retain the value of the addition of any improvements they may have put upon it.

Before this bill was brought, Nathaniel Tucker had assigned the mortgage in question, with the note and other securities, to James Tucker and Isaac Fenno, as trustees, to secure the payment of his indebtedness on the paper of Rhodes, and also all his unsecured creditors. Whether, as against Nathaniel Tucker, the plaintiffs could or could not assert a right to redeem the property mortgaged on payment of the value thereof, the trustees contend that this right cannot be asserted as against them;

that the matter is to be considered as if an indorsement of a promissory note not yet due had been made directly to the creditors as collateral security for their respective debts; and that the law of this Commonwealth allows the indorsee of a promissory note to whom the same is transferred in payment of, or as collateral security for, a preëxisting debt, to enforce payment of the same against the maker, irrespective of the equities existing between original parties. *Blanchard* v. *Stevens*, 3 Cush. 162. *Stoddard* v. *Kimball*, 4 Cush. 604, and 6 Cush. 469. *Culver* v. *Benedict*, 13 Gray, 7. *Fisher* v. *Fisher*, 98 Mass. 303.

The note here in question was an instrument under seal; it appeared distinctly to be secured by mortgage recorded in the Suffolk registry of deeds. There is certainly authority for holding that, where note and mortgage refer respectively to each other, the taker of either must take according to the true title of him who transfers it, as such title appears upon a proper examination. A mortgage note may thus be subject to equities, where strictly commercial paper would not be. *Strong* v. *Jackson*, 123 Mass. 60. By the terms of the mortgage, the grantee covenanted with the grantor that he would release to him " portions of the debt of proportionate amount, as may be agreed upon by the parties." The signer of the note had the right then, under certain circumstances, to pay the note before maturity, and by several and irregular instalments. Notwithstanding, therefore, the language of the note, if the indorsees are charged with knowledge of the contents of the mortgage, as note and mortgage are to be construed together, the promise lacked one element essential to a negotiable note; that is, in being payable absolutely and at a fixed time. *Way* v. *Smith*, 111 Mass. 523. *Stults* v. *Silva*, 119 Mass. 137. But we shall have no occasion fully to discuss whether, had this note and mortgage been directly to a creditor, he could have availed himself, as against the assignees of Nash, of those principles by which commercial paper is protected against prior equities.

The creditors were not parties to the assignment made to the trustees, although they had a beneficial interest thereunder. By the terms of the trust, the trustees received certain mortgages, — the notes were transferred only as incidental thereto, — including the mortgage and note of Nash, for the payment of certain

indorsements of the assignor, to protect certain unsecured creditors, and then, after these payments had been made in full, to pay the surplus to him. They had not the absolute power over the property entrusted to them; they were only to raise money on the securities, or cancel the assignor's indebtedness therewith, when it could be done "without shrinking the mortgages." The creditors had no interest in the notes and mortgages as such, but only in the proceeds which might be obtained therefrom by a performance of the trust. The conveyance cannot be treated as transferring greater rights to the trustees than the assignor himself possessed. The trustees are in his place, and have his rights, and no more. If the note and mortgage in question were assailable in the possession of Tucker, they are not the less so in the hands of one to whom he has transferred them for the purpose of paying his debts, and afterwards paying to himself the balance, provided they can be sold "without shrinking" them, which must mean for their face value. The acceptance of such a trust would not make the trustees purchasers for value.

Where property fraudulently assigned to one to defeat the creditors of the assignor was by the assignee fraudulently assigned and transferred for the payment of his own creditors, it was held that the trustees to whom he had thus transferred could not be deemed innocent purchasers for a valuable consideration, nor stand on a better footing than the fraudulent grantor himself. *Holland* v. *Cruft*, 20 Pick. 321. In *Clark* v. *Flint*, 22 Pick. 231, it was held that an indenture containing a general assignment of a debtor's property, in trust for the payment of his debts and contemplating a release of such debts by his creditors who should become parties thereto, did not constitute the assignees *bona fide* purchasers for a valuable consideration as against one having an equitable title to a portion of the property, unless it was shown that some new responsibility was incurred on the credit of the property, or that the creditors would not have become parties to the indenture if they had known that such portion of the property was held by the debtor in trust. See also *Glidden* v. *Hunt*, 24 Pick. 221.

, In the case at bar, there was no indenture or scheme to which the creditors were a party, nor did they in any way release

Tucker. It is urged that they granted an extension of the time of payment, and thus accepted a new responsibility. This transaction was at a subsequent period, between the trustees and the creditors, and to it the assignor was not in any way a party. It was not possible for the creditors thus to obtain a larger interest or estate than had already been conveyed to the trustees by the assignor. After the trustees had received the mortgages, a meeting of the creditors was held, and the value of the mortgages estimated. To facilitate the administration of the trust by the trustees, and to avoid the embarrassment which would attend suits, it was agreed between the trustees and the creditors that a small percentage should be paid down by the trustees, and the time of payment of debts extended. We do not understand that all the creditors participated in, or became parties to, this agreement, but this is perhaps not important. It was a separate transaction from that of the assignment, and took place at a later period, only that, as between trustees and creditors, the assignment might be conveniently carried out. The trust was not enlarged, as against the assignor or those entitled to assert any rights against his conveyance, by such an arrangement.

There remains only the question of parties, which may, without doubt, be insisted on in the appellate court when it appears that those whose presence is necessary to a proper decision are not before it. *Sears* v. *Hardy,* 120 Mass. 524, 531. *Palmer* v. *Stevens,* 100 Mass. 461. So far as the matter is discretionary, it is settled by the court below.

After the case had been transferred to the full court, an application was made, which was afterwards heard by a single judge, on behalf of the beneficiaries mentioned in the trust deed, that they should be made parties. At the hearing, it was ruled by the presiding judge that it was not necessary, nor, at that stage of the proceedings, expedient, to join them. It has been said by Lord Redesdale, that, as a general rule, where any persons are made trustees for the payment of debts and legacies, they may sustain a suit, either as plaintiffs or defendants, without necessarily bringing before the court the creditors or legatees, which in many cases would be impossible. Mitf. Ch. Pl. (6th Am. ed.) 174. Story Eq. Pl. § 150. A suit to obtain or defend possession of property belonging to trustees, or claimed to belong to them,

is readily distinguishable from one concerning the execution of the trust, where there are often various and conflicting interests between the different *cestuis que trust*. In the case at bar, the trustees had every interest to defend the claims of the beneficiaries to the property in dispute, and had done so until the cause had reached its final stage. The securities were in their possession, and the beneficiaries, the most of whom must have been aware of the controversy, had been content to confide its management to them. It was therefore properly ruled, in the discretion of the presiding judge, that it was not advisable to admit them as parties. *Ashton* v. *Atlantic Bank*, 3 Allen, 217. *Stevenson* v. *Austin*, 3 Met. 474.

At the supplemental hearing referred to, it was suggested by the counsel for the beneficiaries that Rhodes or his assignees should be made parties; but the presiding judge did not deem that question before him, presumably because he held that what was before him was only the application referred to him by the full court. This suggestion is now renewed. It is not accompanied by any application on behalf of either Rhodes or his assignees. That they are fully aware of the pendency of the litigation is not to be doubted, as Rhodes was himself one of the principal witnesses at the hearing of the evidence, more than a year since. It is therefore a question whether the court shall, of its own motion, decline, on this account, to proceed to a final decree. The matter has not been brought to our attention by demurrer, plea, or answer, which is the mode of taking advantage of such defect. 1 Dan. Ch. (5th Am. ed.) 274. Story Eq. Pl. § 236. Nor is any formal application now made that Rhodes shall be made a party upon any ground from which it appears that the defendants will sustain any injury if he is not. In the enterprise of building, Rhodes was a partner with Nash, the business being conducted, and the contracts made, in the name of Nash. Such ready money as the scheme required was furnished almost wholly by Rhodes, and the profits made in the transaction were to be in Rhodes's control. The notes given, on which Nash is heavily indebted, were on the contract made by him and indorsed by Rhodes. The general rule, that all persons interested in the object of an equity suit are to be made parties, is well settled. In order that complete justice may be done, and a

multiplicity of suits avoided, those who have rights and interests in the objects of a suit are joined, so that the necessary modifications of their respective rights may be made, their reciprocal duties and obligations adjusted, and the whole subject of controversy finally determined. *Homer* v. *Abbe*, 16 Gray, 543. It would for this purpose certainly have been advisable that Rhodes and his assignees should have been joined in this suit; and, had the suggestion been earlier made, the court might, of its own motion, perhaps have so ordered. But when it has been postponed until after the final hearing upon the merits, and even after the first hearing in this appellate court, if it is found that entire justice can be done to all parties now before the court, and without prejudice to any of their rights, and that conflicting interests, if there be any, between Rhodes and Nash, or their respective creditors or assignees, may hereafter be adjusted, the objection should not now prevail. Story Eq. Pl. § 237.

As between Nathaniel Tucker and his trustees and Rhodes or his assignees, the matter may here be finally settled, as Nash alone, even if acting for himself and Rhodes, made the contract with Tucker, and with those who placed improvements upon the land. If, as between Nash and Rhodes, or their respective assignees, there is a right on the part of Rhodes or his creditors that the amount which may be recovered, or the advantage which may be derived under the decree, should be availed of to diminish the amount due from Rhodes on his indorsement of Nash's notes, or to yield him or his creditors any other benefit, that may be hereafter considered in a proceeding between them. Since they have not sought to intervene in this suit, the fact that such a right may exist should not prevent us from determining the cause as it is now presented.

*Decree affirmed.*