In re CONSTON, INC., et al., Debtors.

UNITED STATES of America, Appellant,

v.

CONSTON, INC., et al., Appellees.

Civ. A. No. 93–573 MMS.

United States District Court,
D. Delaware.

May 10, 1995.

Gregory M. Sleet, U.S. Atty., and Ellen W. Slights, Asst. U.S. Atty., U.S. Dept. of Justice, Wilmington, DE, for appellant; Gregory S. Hrebiniak, U.S. Dept. of Justice, Washington, DC, of counsel.

James L. Patton, Jr., Laura Davis Jones and David W. O'Connor of Young, Conaway, Stargatt & Taylor, Wilmington, DE, for appellees; Marvin Krasny, Michael L. Temin and Pamela A. Morone of Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, of counsel.

### OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

When one travels the roads leading to the intersection of the Internal Revenue and Bankruptcy Codes, one may expect some curves. The present matter lives up to expectations! This bankruptcy appeal poses the question of whether an Internal Revenue Service claim for corporate income taxes, accorded seventh priority in a Chapter 11 reorganization case and contained in a confirmed reorganization plan, may reacquire a priority position when the debtor defaults on the Reorganization Plan and thereafter files a second Chapter 11. Pared to its core, this question implicates the meaning of "discharge" in the context of serial or sequential Chapter 11 cases and asks whether discharge causes a corporate income tax claim to lose its metaphysical nature as a tax claim when a reorganization plan is confirmed. The bankruptcy court held that the IRS tax claims became a non-priority general unsecured claims after confirmation of the debtor's plan in the initial Chapter 11 proceedings. For the reasons that follow, the Court holds that the IRS claims may qualify for priority treatment in a serial Chapter 11 proceeding, provided the claims meet the statutory requirements for priority set out in the Bankruptcy Code as measured in relation to the debtor's second Chapter 11 petition.

### I. Proceedings Below

On June 20, 1990, Conston Corporation and its subsidiaries (collectively "Conston") filed their first petition for reorganization under Chapter 11 of the Bankruptcy Code in the Eastern District of Pennsylvania. Docket Item ("D.I.") 1, Exhibit ("Exh.") B at ¶ 2, Exh. C at ¶ 2. The Internal Revenue Service ("IRS") filed claims against the debtor's estate for unpaid corporate income taxes accruing during periods prior to the debtor's bankruptcy petition. These unsecured claims received seventh priority for payment by the estate pursuant to 11 U.S.C. § 507(a)(7),[1] and

---

1. 11 U.S.C. §§ 507(a)(7)(A)(i) & (ii) provide:
   The following expenses and claims have priority in the following order:.... Seventh, allowed unsecured claims of governmental units, only to the extent that such claims are for ... a tax on or measured by income or gross receipts—
   (i) for a taxable year ending on or before the date of the filing of the petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition;
   (ii) assessed within 240 days, plus any time plus 30 days during which an offer in compromise with respect to such tax that was made within 240 days after such assessment was pending, before the date of the filing of the petition....

the reorganization plan provided for full payment of the claims as required by 11 U.S.C. § 1129(a)(9)(C).[2] The bankruptcy court confirmed the plan on April 18, 1991. *See generally* D.I. 1, Exh. B at ¶¶ 2–3, Exh. C at ¶¶ 2–3.

Conston began to operate under the reorganization plan and made several payments to the IRS. *Id.,* Exh. B at ¶ 4, Exh. C at ¶ 4. The reorganization plan did not solve Conston's financial woes, however, and, on February 26, 1992, less than one year from the confirmation of the reorganization plan, Conston filed a new Chapter 11 petition in the bankruptcy court for the District of Delaware. D.I. 4 at 2. The present appeal stems from this second Chapter 11 petition.

In the second Chapter 11 proceeding, the IRS filed claims for unpaid portions of corporate income taxes included in the confirmed reorganization plan of the initial Chapter 11. D.I. 1, Exh. A. The IRS again asserted priority for these taxes under 11 U.S.C. § 507(a)(7).[3] Conston agreed that it had an outstanding obligation to the IRS, but asserted that because the original tax claims were discharged in the first reorganization plan, Conston's obligations to the IRS stemming from the reorganization plan should be allowed in the present Chapter 11 only as general unsecured claims. D.I. 1, Exh. B. Relying on *In re Benjamin Coal Co.,* 978 F.2d 823 (3d Cir.1992), the bankruptcy court agreed with Conston and held by order dated November 1, 1993, that "the claims filed by the Internal Revenue Service are disallowed except to the extent that the Internal Revenue Service is allowed a claim in the amount of $367,862.51 as a general unsecured claim."

D.I. 1, Exh. E. Following the bankruptcy court's decision, the IRS appealed. D.I. 1. This Court has jurisdiction to hear the IRS's appeal pursuant to 28 U.S.C. § 158(a). The Court's review of questions of law is plenary. *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 84 (3d Cir.1988).

## II. Stepping Back to View the Big Picture

Before turning to the specific issue presented in this appeal, it is beneficial to briefly survey the "big picture" under the Bankruptcy Code. Broadly speaking, when Congress enacted the Bankruptcy Code in 1978, it envisioned three remedies for a debtor who defaults on a non-fraudulent confirmed Chapter 11 reorganization plan: i) plan modification, including possible modification from a reorganizing to a liquidating plan, 11 U.S.C. § 1127(b) (permitting modification prior to substantial consummation of the confirmed plan); ii) conversion to Chapter 7, 11 U.S.C. §§ 1112(b)(7)–(8) (permitting conversion following default or failure to substantially consummate the reorganization plan); and iii) dismissal of the Chapter 11, *id.* (permitting dismissal following default or failure to substantially consummate the confirmed plan). Over time, debtors began to utilize a fourth option never envisioned by Congress but also not prohibited under the Code enacted by Congress—a second or serial Chapter 11 petition for relief, such as Conston has pursued in this case. *Cf. Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.),* 886 F.2d 859, 869 n. 12 (7th Cir.1989) (noting "the Code, legislative history and commentators to date simply do not consider the possibility of a situa-

The Bankruptcy Reform Act of 1994 amended several Code provisions that apply to this case, including §§ 507(a)(7)(A)(i) & (ii). However, these amendments do not apply to this and other cases commenced prior to the enactment of the statute. Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 702(b)(1), 108 Stat. 4106, 4150 (1994). Therefore, unless otherwise noted, all citations in this opinion refer to the Code as it existed prior to the enactment of the Bankruptcy Reform Act of 1994.

**2.** 11 U.S.C. § 1129(a)(9)(C) provides:
The court shall confirm a plan only if ... the plan provides that ... with respect to a claim of a kind specified in section 507(a)(7) of this title, the holder of such claim will receive on

account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

**3.** The tax claims related to the 1986, 1987, 1988, and 1990 tax periods. The IRS had assessed the 1986, 1987, and 1990 tax period claims in the time between Conston's two Chapter 11 proceedings; the second Chapter 11 petition and the concomitant automatic stay have prevented the IRS from assessing the 1988 tax period claim. *Id.;* D.I. 4 at 2. No information appears in the record concerning the 1989 tax period.

tion in which a completely new liquidating Chapter 11 case could be used to deal with problems that arise in the course of consummation of a prior Chapter 11 plan").[4]

Within the pre-serial Chapter 11 universe of modification, conversion, and dismissal, the courts developed legal constructs to describe the practical implications of the discharge and confirmation concepts found in the Code. The general concept of discharge flows from § 1141, which provides "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan ... discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). The purpose of this section is to give the debtor a fresh start—"a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preëxisting [sic] debt." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934); *accord Citizens Bank & Trust Co. v. Case (Matter of Case),* 937 F.2d 1014, 1024 (5th Cir.1991); *Owaski v. Jet Fla. Sys., Inc. (In re Jet Fla. Sys., Inc.),* 883 F.2d 970, 972 (11th Cir.1989).

To put teeth into § 1141(d), the Code states that discharge voids any existing judgments against the debtor and "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. §§ 524(a)(1)–(2); *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 80 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5866 (stating that discharge acts "as a total prohibition on debt collection actions").[5] The § 524(a) discharge injunction operates into perpetuity to ensure the post-confirmation debtor receives the fresh start envisioned in § 1141(d)(1), and, "[i ]n effect, the discharge extinguishes the debt." *Id.* (emphasis added). The sanctuary of the discharge injunction is limited only as "provided in this subsection, in the plan, or in the order confirming the plan." 11 U.S.C. § 1141(d)(1).

In the pre-serial Chapter 11 universe of plan modification, conversion, or dismissal of a defaulting Chapter 11 plan, the courts borrowed the adjective "extinguished" to create a judicial gloss describing how discharge impairs a creditor's post-confirmation ability to enforce its pre-confirmation claim. When a court states that discharge "extinguishes" a debt, the judicial gloss implies, quite accurately, that the creditor can enforce only those pre-confirmation claims found in the confirmed plan and that the creditor can enforce those claims only in the manner and

---

**4.** The parties before the Court have not contested the propriety of this fourth post-default option for a debtor, and the Court will assume, without deciding, that the Code permits Conston's second Chapter 11 petition. The Court does note that although Congress did not expressly enumerate serial Chapter 11 filings as a viable post-default option, the courts have generally permitted them. *See, e.g., Elmwood Dev. Co. v. General Elec. Pension Trust (Matter of Elmwood Dev. Co.),* 964 F.2d 508, 511 (5th Cir.1992) (approving serial Chapter 11 petitions filed in good faith); *Matter of Official Comm. of Unsecured Creditors of White Farm Equip. Co.,* 943 F.2d 752 (7th Cir.1991), cert. denied, 503 U.S. 919, 112 S.Ct. 1292, 117 L.Ed.2d 515 (1992); *Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.),* 886 F.2d 859, 866–70 (7th Cir.1989) (same); *cf. Johnson v. Home State Bank,* 501 U.S. 78, 87, 111 S.Ct. 2150, 2156, 115 L.Ed.2d 66 (1991) (holding that Congress did not foreclose a Chapter 13 following a Chapter 7 filing and noting that the absence of statutory prohibition of a form of serial filing indicates Congress did not intend to foreclose such a course of action). The Third Circuit Court of Appeals impliedly charted this same course in *In re Benjamin Coal Co.,* 978 F.2d 823 (3d Cir. 1992), a conversion from Chapter 11 to Chapter 7, when it questioned the holding in *White Farm Equip. Co.,* but not the propriety of serial Chapter 11 cases themselves.

**5.** The reorganization plan in Conston's first Chapter 11 case provided that confirmation had an arguably broader effect:

> Except for the obligations of the Debtors under this Plan, confirmation shall discharge all existing claims or interests of any nature whatsoever against or in the Debtors, or any of them, or against or in any of their assets or other property pursuant to § 1141 of the Bankruptcy Code. Except as provided in this Plan, all creditors or holders of interests shall be precluded from asserting against any of the Debtors, their assets or other properties, any other or further claims or interests based upon any act, omission, transaction or other activity of any kind, nature or description that occurred prior to the confirmation date.

D.I. 5 at 4–5.

amount specified in the confirmed plan. From a commercial vantage point, the old debt *is* "extinguished," and a new debt is put in its place. Nevertheless, the courts have recognized the gloss on § 524 for what it is— a legal construct that describes a statutory effect—and plainly held that the statutory definition of discharge, by its own terms, does not cause the underlying debt to vanish. *Johnson v. Home State Bank*, 501 U.S. 78, 84, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991) (holding "[t]he Court of Appeals thus erred in concluding that the discharge of petitioner's *personal liability* . . . constituted the complete termination of the Bank's *claim* against petitioner. Rather, a bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor *in personam* "); *Houston v. Edgeworth (Matter of Edgeworth)*, 993 F.2d 51, 53 (5th Cir.1993) ("A discharge in bankruptcy does not extinguish the debt itself. . . . Section 524(e) specifies that the debt still exists . . . ."); *Shure v. Vermont (In re Sure-Snap Corp.)*, 983 F.2d 1015, 1018, 1019 (11th Cir.1993) (holding that confirmation did not terminate debtor-creditor contract, and instead "prevented . . . enforcing the terms of the Agreement . . . to collect pre-confirmation debt," so that the discharged contract could therefore support award of attorney's fees incurred post-confirmation); *Copeland v. Merrill Lynch & Co., Inc.*, 162 B.R. 743, 746, 747 (E.D.La.1993) ("the bankruptcy reorganization plan did not extinguish or 'novate' the obligations to repay or reduce the [debts]"); *Polysat, Inc. v. Union Tank Car Co. (In re Polysat, Inc.)*, 152 B.R. 886, 895 (Bankr.E.D.Pa.1993); *Shade v. Fasse (In re Fasse)*, 40 B.R. 198, 200 (Bankr.D.Colo.1984) ("Although a discharge . . . relieves the debtor from personal liability . . . it does not have the effect of extinguishing the debt"); *cf. Wagner v. United States*, 573 F.2d 447, 453 (7th Cir.1978) (noting "that a discharge does not cancel the obligation; the obligation still exists. A discharge merely disables the creditor from enforcing its claim") (interpreting the Bankruptcy Act of 1898).

In a separate line of cases, the courts, including the Third Circuit Court of Appeals, have recognized that "discharged" debts continue to exist despite their unenforceability against the debtor on the basis of 11 U.S.C. § 524(e), which states "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." *See, e.g., First Fidelity Bank v. McAteer*, 985 F.2d 114, 118–19 (3d Cir.1993) (holding that § 524(e) did not release non-debtor parties from their obligations and liabilities arising from the discharged debt) (collecting cases); *see also Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1449 (6th Cir.1993) (holding debtor's discharge did not affect guarantor's obligation to creditor); *Hendrix v. Page (Matter of Hendrix)*, 986 F.2d 195, 197 (7th Cir.1993) (relying on §§ 524(a)(2) and 524(e)); *Walker v. Wilde (In re Walker)*, 927 F.2d 1138, 1141–44 (10th Cir.1991) (holding § 524(e) did not prohibit creditor from bringing action against the debtor to establish existence of the debt, albeit "discharged," that was a prerequisite to suit against guarantor); *Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (Matter of Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1351 (5th Cir.1989) (holding that discharge does not release non-debtor guarantors); *Kathy B. Enter., Inc. v. United States*, 779 F.2d 1413, 1414–15 (9th Cir.1986) (holding that discharge did not prevent the IRS from collecting discharged taxes from recipient of debtor's fraudulent conveyance); *Pettibone Corp. v. Hawxhurst*, 163 B.R. 989, 993–95 (N.D.Ill.), *aff'd*, 40 F.3d 175 (7th Cir.1994). These cases, and the plain language of § 524 itself, all illustrate Congress's underlying premise in enacting § 524: although unenforceable in their pre-confirmation form against the debtor, "discharged" debts, and their attendant duties, obligations, and liabilities, remain viable post-confirmation. Thus, while the creditor may not *enforce* her claim as it existed pre-confirmation, the claim nevertheless continues to *exist*.

### III. Conston's Position

In the face of this well-settled understanding, Conston seeks to extend and redefine the meaning of discharge in a manner far removed from that contemplated by Congress and in derogation of Congress's explicit statutory directives. The essence of Conston's position is that confirmation of the

Chapter 11 reorganization plan strips a tax claim of its identity as a tax claim and substitutes in its stead a contractual obligation to make payment under the plan. Without the characteristics of a claim for taxes, then, Conston asserts the IRS claim cannot qualify for priority treatment under 11 U.S.C. § 507(a)(7) in a second Chapter 11 proceeding.

Conston finds support in *In re Benjamin Coal Co.*, 978 F.2d 823 (3d Cir.1992). In *Benjamin Coal*, the debtor originally filed a Chapter 11 petition in October, 1984, and the bankruptcy court confirmed a reorganization plan on October 4, 1985. This reorganization plan provided for payment of an administrative priority claim held by the debtor corporation's majority shareholder. As in this case, the debtor could not fulfill the terms of the confirmed plan, and the debtor subsequently moved to convert its Chapter 11 reorganization to a Chapter 7 liquidation. In the converted Chapter 7 case, the shareholder argued that his claim continued to merit administrative priority status. *Id.* at 825–26.

The bankruptcy court, the district court, and the Third Circuit Court of Appeals all disagreed with the shareholder and held that administrative expenses incurred in a Chapter 11 reorganization do not automatically retain administrative expense priority in a subsequent conversion to Chapter 7. The court of appeals held that, post-confirmation, the creditor had only *"former* administrative claims" and no longer held the *right* to preferential treatment that the creditor had held before confirmation. *Id.* at 827. In other words, the court held the shareholder "simply no longer had an 'administrative claim'" and stated:

> [O]nce the reorganization plan is approved by the bankruptcy court, each claimant gets a 'new' claim, based upon whatever treatment is accorded to it in the plan itself. Thereafter, each claimant's remedies for any future nonpayment of claims acknowledged in the plan are limited to the usual remedies for the type of claim granted by the plan's provisions.

*Id.* According to Conston, *Benjamin Coal* stands for the proposition that, post-confirmation, the IRS holds former tax claims with

no relationship whatsoever to the claims' original nature as corporate income taxes and that these IRS claims consequently cannot qualify as taxes for priority treatment under § 507(a)(7).

Conston draws further support from dicta found in *Benjamin Coal*. In the concluding portion of its opinion, the *Benjamin Coal* court questioned a Seventh Circuit Court of Appeals holding on the issue identical to that presently before this Court. In the *Matter of Official Comm. of Unsecured Creditors of White Farm Equip. Co.*, the court of appeals held that a trust fund tax claim contained in a confirmed Chapter 11 plan could acquire priority status in a subsequent Chapter 11 if the claim could independently qualify for priority status in the second bankruptcy proceeding. 943 F.2d 752, 757 (7th Cir.1991), *cert. denied*, 503 U.S. 919, 112 S.Ct. 1292, 117 L.Ed.2d 515 (1992). Implicitly, the *White Farm* Court thus recognized that tax characteristics survive confirmation and discharge so as to potentially fall under the purview of § 507(a)(7) in a subsequent Chapter 11 proceeding. In questioning the Seventh Circuit, the Third Circuit Court of Appeals stated that *"White Farm* may be contrary to the legislative intent underlying Section 1141(d)(2)" and characterized *White Farm* as a "debatable interpretation of the effects of Section 1141(d) on tax claims." *In re Benjamin Coal Co.*, 978 F.2d at 828.

■ The Court does not read *Benjamin Coal* as broadly as Conston and the bankruptcy court below. First, although the court of appeals did use broad language in criticizing the Seventh Circuit's *White Farm* decision, this language amounts to no more than dicta, albeit strong dicta. Chief Justice Marshall established long ago that "[i]t is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821). Thus, while dicta may be instructive as to the position of a particular appellate panel, it is not

binding on the lower Court. *Menell v. First Nat'l Bank (In re Menell)*, 37 F.3d 113, 114–15 n. 1 (3d Cir.1994) (finding unpersuasive cases cited in dicta by the Supreme Court); *Children's Hosp. of Pittsburgh v. 84 Lumber Co. Medical Benefits Plan*, 834 F.Supp. 866, 868 n. 4 (W.D.Pa.1993); *Furcini v. Equibank, NA*, 660 F.Supp. 1436, 1441 (W.D.Pa. 1987) (Aldisert, J., sitting by designation). In fact, it is not uncommon for the Third Circuit Court of Appeals to avoid its own prior statements or positions by explaining them away as dicta and implying they are not binding on the appellate court. *See, e.g., Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 778 n. 4 (3d Cir.1994); *United States v. Ricks*, 5 F.3d 48, 50 (3d Cir.1993). As a consequence, while enjoying the benefit of dicta discussing priority tax claims in serial Chapter 11 cases, this Court is nonetheless free to independently examine the issue.

Second, the *Benjamin Coal* court quite simply never discussed whether a claim's intrinsic pre-petition attributes survive discharge, and the court never stated the 'new' claims granted in the reorganization plan may never acquire priority status in a subsequent Title 11 proceeding. What the court of appeals unequivocally *did* hold was that the bankruptcy created characteristic of priority does not, of its own accord, survive confirmation of the plan and automatically resurrect itself in a future Title 11 proceeding. *In re Benjamin Coal Co.*, 978 F.2d at 827. *Benjamin Coal* therefore did not address the issue presented by Conston—does confirmation change the "type of claim" so as to eliminate the characteristics that would permit the claim to qualify for priority treatment in a subsequent Chapter 11 proceeding?

Third, *Benjamin Coal* neither endorsed the judicial gloss of discharge that would 'extinguish' all vestiges of the original claim nor displaced the bedrock principle that discharge only enjoins enforcement while leaving the underlying debt in place. Furthermore, because "characteristic[s] fitting in certain contexts may be unsuitable in others," *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, —— U.S. ——, ——, 115 S.Ct. 810, 816, 130 L.Ed.2d 740 (1995), the Court will not lightly assign to the court of appeals an intent to apply a judicial gloss developed at a time when serial Chapter 11 cases were unknown. *Cf. also Furcini v. Equibank*, 660 F.Supp. at 1440 ("Just as meanings are sometimes lost in the translation of expressions from one language to another, the utility of formulae can be lost in their migration across legal fields.").[6] In sum, I read nothing in *Benjamin Coal* that forecloses a claim arising pre-second petition, including a claim treated in a prior reorganization plan, from meriting priority status in a second Chapter 11, provided that the claim's attributes fall within the strictly defined priority categories of § 507 as those categories relate to the second Chapter 11.[7]

## IV. Analysis

■ The Court concludes that, at least in the case of corporate income taxes, some attributes of the underlying tax claim must

---

**6.** Conston also cites *American Bank and Trust Co. v. United States (In re Barton Indus., Inc.)*, 159 B.R. 954 (Bankr.W.D.Okla.1993), and *Matter of Depew*, 115 B.R. 965 (Bankr.N.D.Ind.1989), for the proposition that confirmation bars the assertion of § 507(a)(7) priorities because confirmation binds the IRS to the terms of the confirmed plan. Conston's reliance on these cases is misplaced. Both cases deal with the *res judicata* effect of an order confirming a reorganization plan. Neither case discusses the characteristics of a claim contained in a confirmed reorganization plan or whether these characteristics, if they exist, may support a finding of priority status in a serial Chapter 11 case.

**7.** One additional issue bordering on the metaphysical requires mention—are priority corporate income tax claims contained in a confirmed plan the same claims that existed preconfirmation, albeit with the limitations on enforcement that accompany confirmation and discharge, as suggested by the plain language of § 1141 and the cases interpreting § 524, *see supra* text at 772–73, *see also Matter of Ribs–R–Us, Inc.*, 828 F.2d 199, 203 (3d Cir.1987) ("confirmation of a plan discharges most preconfirmation debts except to the extent that they are included in the plan") (citation omitted), or, on the other hand, does confirmation replace priority tax claims with entirely new claims, as suggested by the court of appeals' language in *Benjamin Coal Co.*, *see* 978 F.2d at 827 ("each claimant gets a 'new' claim")? This Court is, of course, bound by *Benjamin Coal*, but as the next section will demonstrate, whichever theory is followed, the postconfirmation claim held by the IRS must have tax characteristics.

survive confirmation and discharge, and therefore that the IRS claims in this case may qualify for priority treatment in the present Chapter 11 proceeding. Accepting any other position conflicts with the plain language of both the Bankruptcy and Internal Revenue Codes. Furthermore, accepting any other position confounds the clearly expressed congressional policies concerning taxes embodied in the Bankruptcy Code. As always, the inquiry must begin with the plain language of the statute. *Norfolk and W. Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991).

### A. Assessment of Tax Claims

■ Broadly speaking, the Internal Revenue Code authorizes the Secretary of the Treasury to make an assessment of all federal taxes not paid in a timely manner. 26 U.S.C. § 6201(a). An assessment is "essentially a bookkeeping notation ... made when the Secretary ... establishes an account against the taxpayer on the tax rolls," *Laing v. United States*, 423 U.S. 161, 170 n. 13, 96 S.Ct. 473, 479 n. 13, 46 L.Ed.2d 416 (1976), and assessment fixes the amount of tax liability, *Cohen v. Gross*, 316 F.2d 521, 522–23 (3d Cir.1963). Absent voluntary payment, the IRS has no statutory power to collect a tax, including a corporate income tax, until the IRS makes a valid assessment. 26 U.S.C. § 6501(a) ("no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period [for assessment]"); *Philadelphia & Reading Corp. v. United States*, 944 F.2d 1063, 1064 n. 1 (3d Cir.1991); *Ewing v. United States*, 914 F.2d 499, 503–04 (4th Cir.1990) ("This section simply mandates that the United States has no authority to collect a tax forcibly after the applicable period for assessment has expired."), *cert. denied*, 500 U.S. 905, 111 S.Ct. 1683, 114 L.Ed.2d 78 (1991); *In re Flanigan's Enter., Inc.*, 75 B.R. 446, 449 (Bankr. S.D.Fla.1987) ("Until a tax is assessed, the statutory prerequisites of the Internal Revenue Code have not been met, and an unassessed tax cannot be collected by filing a proof of claim or otherwise."). Once a tax is properly assessed, the Secretary may collect it "by levy or by a proceeding in court." 26 U.S.C. § 6502(a).

■ Not unexpectedly, it is common for corporations to file a Chapter 11 reorganization petition while delinquent in the payment of as yet unassessed corporate income taxes. When the debtor files a petition for relief, the automatic stay provisions of the Bankruptcy Code restrain the IRS from assessing or collecting delinquent taxes. 11 U.S.C. § 362(a)(6). The automatic stay does not indefinitely forestall assessment of delinquent taxes, however; 11 U.S.C. § 505(c) permits assessment of a tax, "notwithstanding section 362 of this title," once the bankruptcy court has made a determination of tax liability. Congress also coordinated the automatic stay with the procedural aspects of the assessment in the Bankruptcy Tax Act of 1980. *See* S.Rep. No. 1035, 96th Cong., 2d Sess. 48 (1980), *reprinted in* 1980 U.S.C.C.A.N. 7017, 7061; *see generally id.* at 46–53, *reprinted* at 7059–66. The IRS may immediately assess any deficiency on "the debtor" as soon as "liability for such tax has become res judicata pursuant to a determination in a case under title 11 of the United States Code," 26 U.S.C. § 6871(b)(2);[8] in other words, Congress authorized the IRS to assess a tax as soon as the tax has become fixed by a final judgment by an appropriate court in the bankruptcy process. *See also* S.Rep. No. 1035 at 49, *reprinted in* 1980 U.S.C.C.A.N. at 7062 ("[Because] no purpose would be served by requiring issuance of a deficiency notice prior to assessment....., the bill permits immediate assessment of a corporate debtor's tax liabilities once the bankruptcy court has made a determination which is res judicata."); *id.* at 50, *reprinted* at 7063 ("if the bankruptcy court has made a determination of the debtor's tax liability which (under the doctrine of res judicata) precludes the debtor from relitigating the

---

**8.** Title 26 U.S.C. § 6216(1) states that subchapter B of chapter 70 of Title 26 [26 U.S.C. §§ 6871–72] details assessment procedures for receivership proceedings. *Accord Cohen v. Gross*, 316 F.2d 521, 523 (3d Cir.1963) (holding that Chap-

ter 70 of the Internal Revenue Code provides "[a] different collection scheme for assessment and collection in cases where bankruptcy intervenes") (analyzing Internal Revenue Code interaction with Bankruptcy Act).

issue in any other court, the Revenue Service can make an immediate assessment of such liability without issuing a deficiency notice"). The only limitation on the period of assessment in a bankruptcy case appears in 26 U.S.C. 6503(h)(1), which suspends the limitations period for assessment "for the period during which the Secretary is prohibited by reason of such case from making an assessment" and for 60 days thereafter, regardless, apparently, of whether the debtor has received a discharge of the tax claim against her. In sum, §§ 6871 and 6503(h) of the Internal Revenue Code demonstrate Congress contemplated that assessment may occur before or after confirmation and discharge. Indeed, in this case, the IRS assessed the 1986, 1987, and 1990 tax period claims after the bankruptcy court confirmed Conston's reorganization plan. D.I. 1, Exh. A.

█ Just as the Internal Revenue Code contemplates assessment activity during the post-confirmation period, the Code contemplates that the IRS may undertake tax collection activities during the post-confirmation period. The Code provides that the Secretary may collect an assessed tax "by levy or by a proceeding in court" within the applicable limitations period. 26 U.S.C. § 6502(a)(1). A bankruptcy petition will suspend this limitations period, however, "for the period during which the Secretary is prohibited by reason of such case ... from collecting" and for 6 months thereafter. 26 U.S.C. § 6503(h)(2). As with assessment, the fair import of these sections is that the monies collected by the IRS for claims granted in the confirmed plan are tax monies.

Several other factors point to the same conclusion. First, the legislative history of the Bankruptcy Tax Act of 1980 indicates that Congress intended "the provisions of the Code relating to collection of assessed taxes apply" after assessment in a bankruptcy case. S.Rep. No. 1035 at 50, *reprinted in* 1980 U.S.C.C.A.N. at 7063. Second, neither the Internal Revenue nor the Bankruptcy Codes limit the application of § 6503(h)(2) to any class of debtor entity or to any class of priority tax claims. Third, when Congress amended § 6503(h) in the Bankruptcy Tax

Act of 1980, it did not add any restrictions on § 6503(h)'s applicability to Chapter 11 cases. Finally, while at least one court has held that § 6503(h) applies only to Chapter 7 and individual Chapter 11 cases, *see In re Flanigan's Enter., Inc.*, 75 B.R. 446, 449–50, 451 (Bankr. S.D.Fla.1987), nothing in the plain language of the Titles 11 or 26 restricts the operation of § 6503(h)(2). Further, the Court's interpretation of § 6503(h) has the benefit of not reading a restriction into the statute—the *Flanigan's Enterprises* limitation of the statute to Chapter 7 and individual Chapter 11 cases—not alluded to in either the text of Titles 26 and Title 11 or in the legislative histories of the Bankruptcy Reform Act of 1978, the Bankruptcy Tax Act of 1980, and other more recent amendments to the Bankruptcy Code and its correlative Internal Revenue Code provisions. In sum, notwithstanding *In re Flanigan's Enterprises, Inc.*, nothing in the plain language of the Internal Revenue or Bankruptcy Codes suggests that confirmation of the reorganization plan relieves the Secretary from following §§ 6501–6503 when collecting priority tax claims.

Placed against the backdrop of the post-confirmation assessment and collection activities permitted by statute, the difficulties with Conston's position emerge. For example, under Conston's theory, the IRS could not assess the 'new' claim pursuant to 26 U.S.C. § 6871 because discharge "extinguishes" the original tax claim and eviscerates the very identification of the IRS claim as a claim arising from taxes. In fact, the IRS could never assess a discharged priority tax, regardless of whether a second Chapter 11 occurs or not, because the IRS claim would no longer exist as a tax claim. Likewise, the IRS would have no authority to collect its post-discharge claim because the statutory prerequisite to collection, the assessment, could not take place. Indeed, it is not at all inconceivable that a discharged debtor would attempt to defend against an IRS action for unpaid discharged priority taxes by asserting the maxim "taxation is a game which must be played strictly in accordance with the rules," *Philadelphia & Reading v. United States*, 944 F.2d 1063, 1070 (3d Cir.1991) (quoting *Richardson v. Smith*, 301 F.2d 305, 306 (3d Cir.) (per curiam), *cert. denied*, 371 U.S. 820,

83 S.Ct. 36, 9 L.Ed.2d 60 (1962)), and arguing the IRS has no statutory authority to collect, as a contract claim or otherwise, for failure to make a valid assessment. Such a result is inconsistent with the provision for priority tax claims in the first instance and does not comport with the IRS practice of making its assessment after plan confirmation. Therefore, because collection requires assessment, the only conclusion is that the claims granted in the confirmed plan must have an identity as claims for taxes.

Nothing in this analysis derogates from the discharge and confirmation provisions of § 1141(d)(1). Permitting the IRS to assess a claim that is *res judicata,* even after confirmation, does not expand the debts and claims against the debtor. Further, the discharge injunction does not act as a blanket prohibition on collection activities; § 1141(d)(1) discharges the debtor "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan." As such, if the plan provides for payment of debts, statutorily required actions to create collection authority in the IRS, such as assessment, may be treated as falling within the § 1141(d)(1) caveat to the scope of discharge. *Accord Norris Grain Co. v. United States (In re Norris Grain Co.),* 168 B.R. 264, 265 (M.D.Fla.1993) (permitting assessment post-confirmation on grounds that plan provision calling for payment of taxes over six year period "contemplated that assessments would be made"), *aff'd,* 42 F.3d 643 (11th Cir.1994). While one could object that 26 U.S.C. § 6322 creates a lien against the debtor at the time of assessment, Congress appears to have foreseen and resolved this potential discharge violation, as 26 U.S.C. § 6325 requires the Secretary to release of all tax liens rendered legally unenforceable. Section 6325 thus acts in a sort of symmetry with

§ 524(a)(2) and prevents any clash between the tax and bankruptcy codes stemming from a post-petition assessment.[9]

What discharge means is that the IRS no longer retains its full panoply of collection powers; the plan defines to the exclusion of all else the permissible modes of collecting the debt. But defining the mode of payment and collection does not mean that the 'new' claim loses the character of the underlying debt. The key is to distinguish between permissible modes of post-confirmation collection and the statutory prerequisites to collection, i.e., what does the IRS have to do to have the power to collect? While the confirmed plan may give the IRS the right to collect, the Internal Revenue Code requires an assessment prior to authority attaching in the IRS to collect.

The fact that post-confirmation collection and assessment is possible demonstrates beyond question the existence of tax characteristics in the IRS claims at issue in this appeal. Therefore, the Court holds the claims' tax characteristics may be used to determine how to treat the claims under § 507(a)(7). That is not to say that a tax debt automatically arises to priority status in a second Chapter 11 simply because it held that status in the first Chapter 11; at most, the tax claim *may* rise to priority status.

## B. *Legislative Intent*

The evident legislative purpose that gave rise to tax priorities in the first instance further verifies the conclusion mandated by the statutory structure. There is no indication in the legislative history that Congress ever contemplated the advent of serial Chapter 11 cases or the effect of § 524 on the debtor's obligations in a second Chapter 11

---

**9.** This view of assessment is consistent with Congress's most recent pronouncement on the automatic stay in the Bankruptcy Reform Act of 1994. In an amendment that permits assessment despite the automatic stay, the Act states that "any tax lien that would otherwise attach to property of the estate by reason of such assessment *shall not take effect* unless such tax is a debt of the debtor that will not be discharged in the case." Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 116, 108 Stat. 4106, 4119 (1994) (amending 11 U.S.C. § 362(b)(9)) (emphasis add-

ed). *Contra United States v. W.F. Monroe Cigar, Co. (In re W.F. Monroe Cigar, Co.),* 166 B.R. 110, 113 (N.D.Ill.1994) (permitting the IRS to perfect lien on discharged tax claim). While instructive as to congressional intent on the interplay between the discharge injunction and the Internal Revenue Code, the Court is cognizant that the Bankruptcy Reform Act of 1994 does not apply to cases commenced prior to the enactment of the statute. Bankruptcy Reform Act of 1994, § 702(b)(1), 108 Stat. at 4150.

proceeding. The plain language of the Code simply does not treat serial Chapter 11 cases; no extant legislative history treats "discharged" debts in serial Chapter 11 cases. A lack of Congressional anticipation, however, "in no way modifies the conventional judicial duty to give faithful meaning to the language Congress adopted in the light of the evident legislative purpose in enacting the law in question." *United States v. Bornstein*, 423 U.S. 303, 310, 96 S.Ct. 523, 528, 46 L.Ed.2d 514 (1976). As a consequence, while the Court proceeds under the rubric of congressional intent, in reality the Court can only attempt to faithfully implement the Code enacted by Congress with an eye to assuring that the changed circumstances of serial Chapter 11 petitions do not frustrate the evident congressional intent. As Judge Rosenn has stated somewhat analogously:

> [w]hen a statute is adopted from one jurisdiction into the jurisprudence of another, it will be construed so as to harmonize it with its new environment in preference to a rigid adherence to the interpretation given it in its original home; especially is this true when the construction given it in its original home would render it inconsistent with the system into which it has been adopted.

*Berkeley v. West Indies Enter., Inc.*, 480 F.2d 1088, 1095 (3d Cir.1973) (dissenting opinion) (citation omitted).

Independent examination of the evident legislative purpose must begin with the recognition that Congress provided priority payment status for the claims of certain unsecured creditors because "special circumstances or special need" warranted a departure from the fundamental bankruptcy policy of pro rata distribution of assets to unsecured creditors. H.Rep. No. 595, 95th Cong., 2d Sess. 186 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6147. The Senate Judiciary Committee Report provided some broad insight into why taxes received special treatment in the Bankruptcy Code. After noting the "collection of taxes ... has presented one of the most difficult problems for the committee," the committee articulated the principle that "the goals of rehabilitating debtors and giving equal treatment to private voluntary creditors must be balanced with the interests of governmental tax authorities who, if unpaid taxes exist, are also creditors in the proceeding." *See* S.Rep. No. 989, 95th Cong., 2d Sess. 13–14 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5799–5800. The Senate Committee Report goes on with respect to taxes:

> Since tax authorities are creditors of practically every taxpayer, another important element is that tax collection rules for bankruptcy cases have a direct impact on the integrity of the Federal, State and local tax systems. These tax systems, generally based on voluntary assessment, works [sic] to the extent that the majority of taxpayers think they are fair. This presumption of fairness is an asset which should be protected and not jeopardized by permitting taxpayers to use bankruptcy as a means of improperly avoiding their tax debts. To the extent that debtors in a bankruptcy are freed from paying their tax liabilities, the burden of making up the revenues thus lost must be shifted to other taxpayers.

> A three-way tension thus exists among (1) general creditors, who should not have the funds available for payment of debts exhausted by an excessive accumulation of taxes for past years; (2) the debtor, whose "fresh start" should likewise not be burdened with such an accumulation; and (3) the tax collector, who should not lose taxes which he has not had reasonable time to collect or which the law has restrained him from collecting.

*Id.* at 14, *reprinted* at 5800. In adjusting the tension between a Chapter 11 debtor, the debtor's creditors, and taxing authorities, Congress intended and ultimately provided taxes a seventh priority coupled with a mechanism for relegating to general creditor status statutorily defined "stale" taxes. *See* 11 U.S.C. § 507(a)(7). Keeping in mind that Congress did not anticipate serial Chapter 11 cases, this statement of Congressional intent concerning treatment of tax claims cannot be seriously controverted.

The issue then becomes whether this evident legislative purpose in treating tax claims should be frustrated by the unfore-

seen legal maneuver of serial Chapter 11 cases. Conston offers no explanation as to how its position comports with congressional intent. In the hypothetical circumstance where officers and/or shareholders have general claims against a Chapter 11 debtor (a not uncommon occurrence), for example, the Conston theory would place these creditors in a relatively better position if the reorganization plan provided for payment of their allowed claims prior to those of the IRS and if the debtor should then file a second Chapter 11 petition. In the second proceeding, these creditors could argue that the IRS claims are general unsecured claims entitled to no priority and, quite probably, thereby diminish or eliminate them in a manner that 11 U.S.C. § 1129(a)(9)(C) would not have permitted in the first reorganization plan. While the tax system of this country has been characterized as voluntary, it is voluntary as to payment, not liability. Conston's theory, if adopted, would redefine the phrase "voluntary tax system," and I find that Congress did not intend to permit Chapter 11 reorganization petitioners to choose whether to pay uncontested delinquent corporate income taxes that the Bankruptcy Code requires the debtor to pay in full to secure the much desired discharge. *See* 11 U.S.C. § 1129(a)(9)(C); *see also Matter of Ribs–R–Us, Inc.,* 828 F.2d 199, 202 (3d Cir.1987) ("[a] plan of reorganization cannot be confirmed unless the statutory requirements regarding priority claims are met, including the requirement that priority tax claims be paid in full"). Rather than comport with the will of Congress, Conston's theory would permit the debtor to avoid § 1129(a)(9)(C)'s mandate to pay priority tax claims in full and thereby skillfully subvert the carefully crafted Congressional balance between taxpayers, the government, and the creditors.

## V. Conclusion

The advent of serial Chapter 11 cases has forced litigants and the courts to confront a host of interpretive issues fraught with the danger of unwittingly expanding accepted precepts in contravention of Congress's overall bankruptcy scheme, not to mention expanding those precepts in a manner unforeseen by those who first articulated them in a universe devoid of the potential for serial Chapter 11 filings.

In this case, Conston's position that the judicial gloss of discharge 'extinguishes' the original IRS corporate income tax claim creates a raft of conceptual and practical problems. The conceptual problems arise from the fact that the gloss would cause the IRS's priority corporate income tax claims to cease to exist as tax claims at the time of confirmation, thereby preventing the IRS from making the assessment requisite to cloaking the IRS with statutory collection authority. In fact, the gloss would prohibit all assessment activities after confirmation, whether a subsequent Chapter 11 ensues or not, and would even prohibit the assessments made in the period intervening between the two Chapter 11 proceedings in this case. These conceptual problems highlight the inherent contradiction between Conston's proposed extension of the judicial gloss and the plain language of the Internal Revenue and Bankruptcy Codes. Additionally, these conceptual problems arise whether the IRS's post-discharge claim is a 'new' claim or a continuation of the pre-confirmation claim, albeit with limitations on the manner of enforcement.

The practical problems arise from the fact that Conston's position would allow the Chapter 11 debtor to choose whether to abide by the evident Congressional purpose embodied in the priorities of 11 U.S.C. § 507(a)(7). Granting the taxpayer the ability to convert a claim within the sphere of 11 U.S.C. § 1129(a)(9)(C) into a general unsecured claim by filing a second Chapter 11 petition would have to be considered remarkable. Without some indication that Congress intended this result, I hold that priority corporate income tax claims contained in a confirmed reorganization plan must embody the characteristics that may entitle them to priority treatment if a second Chapter 11 petition is filed.

■ Finally, once it is established that the corporate income tax claims contained in the confirmed plan have tax characteristics, it is clear that the claims may, but do not necessarily, qualify for continued priority status in a second Chapter 11. Generally, § 507(a)(7) looks for certain characteristics of tax claims,

such as the date of accrual, to determine whether the claims merit priority status. The IRS has conceded that, at most, only those claims that have the characteristics described in § 507(a)(7), as measured from Conston's second Chapter 11 petition, are entitled to priority treatment in this proceeding. D.I. 4 at 18–20. In other words, the IRS, at least for this litigation, does not assert that simply because priority existed in Conston's first Chapter 11 case, priority exists in this case. This comports with the broad lesson of *Benjamin Coal*—that the bankruptcy created characteristic of priority does not exist beyond the bankruptcy case in which it was created; a § 507 priority, if it exists at all, must stem from the claim's characteristics extant in the current bankruptcy proceeding. *In re Benjamin Coal Co.*, 978 F.2d at 827; *cf. Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.)*, 886 F.2d 859, 870 (7th Cir.1989) ("To receive an administrative priority in [the second Chapter 11, the creditor] must demonstrate its claims relative to [the second Chapter 11]; an administrative priority in [the first Chapter 11] does not translate to an administrative priority in [the second Chapter 11]").

An order will issue remanding this matter to the bankruptcy court for entry of judgment consistent with this Opinion, including fixing the amount of priority indebtedness.