Lopez, J.
This case comes before the court on a motion for an assessment of damages filed by the plaintiff. After filing for Chapter 11 bankruptcy protection, the defendants defaulted on the terms of the reorganization plan requiring them to make certain payments to the plaintiff, a secured creditor. The plaintiff commenced foreclosure proceedings and filed for an assessment of damages, including a deficiency. Pursuant to the terms of the original note, the plaintiff also included in its calculation of damages an award of attorneys fees related to foreclosure, an inclusion contested at oral argument by the defendants. Thereafter, the parties were ordered to brief the issue. After careful consideration, the court ALLOWS plaintiffs motion for an assessment of damages including the attorneys fees related to foreclosure.
BACKGROUND
On January 11, 1989, the defendants, Philip and Janice Burnes (“the Burnes”) executed a promissory note in the principal sum of $950,000 between Philip J. Burne d/b/a Hanson Bog Company, Philip J. Burne, Trustee of Anderbume Realty Trust, Philip J. Burne, Individually, and Janice A Burne, individually, in favor of Myles Standish Federal Credit Union. In pertinent part, that note reads:
DEFAULT:... If there is a default, the Credit Union may demand all sums due under this Note . . . The sums which must be paid are the unpaid balance of this Note together with unpaid interest plus all costs of collection of this Note for the foreclosure of any Security Agreement [mortgage] securing this Note . . . These costs include reasonable attorneys fees not to exceed the amount allowed by law.
On that same day, the Burnes secured the note by a mortgage on property located in Hanson, MA (“the property”). The mortgage states in relevant part:
This Security Agreement [mortgage] secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications: and (b) the performance of Borrower’s covenants and agreements under this Security Agreement [mortgage] and the Note.
BY SIGNING BELOW, the borrower accepts and agrees to the terms and covenants contained in this Security Agreement [mortgage] and in any rider(s) executed by Borrower and recorded with it.
On September 13, 1989, the Burnes executed a second note in the amount of $50,000 in favor of Myles Standish Credit Union, similarly secured by the mortgage on the property.
The Burnes filed for Chapter 11 Bankruptcy protection in the United States Bankruptcy Court on February 16, 1993. As a result, the National Credit Union Administration (“NCUA”), then holder of the Burnes’ notes, filed a proof of claim in the amount of $1,055,637.16, the balance owed on both notes.[1] On September 20, 1994, the Bankruptcy Court confirmed the Burnes’ Fourth Amended Chapter 11 Reorganization Plan (“the Plan”). Under the terms of the Plan, NCUA’s claims under the notes were bifurcated into a secured claim of $1,000,000.00 and an unsecured claim of $55,637.00. The Plan dictated that the Burnes pay the $1,000,000.00 secured claim as follows: (1) a cash payment of $360,000 on the effective date of the Plan; (2) execute two promissory notes totaling $550,000; the first note of $250,000 payable monthly at 7% interest amortized over a 25-year period; the second note of $300,000 payable over a seven-year period at 8% interest, with annual balloon payments of $30,000, and a final balloon payment at the end of the seven years;[2] and (3) the remaining $90,000 of the secured claim was to be paid by way of a $60,000 cash payment in the first quarter of 1995, and a $20,000 cash payment in the last quarter of 1995, at a 7% annual interest. Finally, the Plan provided that “NCUA shall retain the security interest in the collateral that it held on the petition date, to the extent of its allowed secured claim,” thus leaving in place the mortgage on the property as security for the secured claim of $1,000,000.
The Burnes did not make any of the payments called for under the Plan, and did not execute either of the two promissory notes required by the Plan. On February 27, 1995, IAG filed a motion to convert or dismiss the Chapter 11 case, or alternatively, for relief from stay to allow foreclosure. The Court granted IAG relief from stay on March 28, 1995, and entered a final *434 decree in the bankruptcy proceedings on May 16, 1995.
The foreclosure sale was held on August 17, 1995, and IAG, the only bidder, acquired the property for the bid price of $500,000. On August 30, 1995, the Burnes filed a complaint for declaratory judgment to set aside the foreclosure in the Land Court alleging various defects in the foreclosure proceeding and that IAG had improperly cited the original promissory notes, instead of the Plan, as the source of the debt.
On October 18, 1996, the Land Court allowed IAG’S motion for summary judgment, finding, among other things, that any reference to the original note caused no harm to the Burnes. Additionally, in dictum, the Land Court stated that “by virtue of the Chapter 11 proceeding, the Burnes were immune from a deficiency judgment.”[3]
IAG, nonetheless, filed a motion to collect deficiency on May 12, 1997, calculating the deficiency amount based on the amounts and terms set forth in the Plan, not the amounts and terms set forth in the original notes. In response to IAG’s motion for summary judgment in this action, the Burnes unsuccessfully argued that the Land Court’s single reference to the deficiency estopped IAG from collecting it. The Court (Sosman, J.) found that neither the Plan nor the Bankruptcy Code supported the Burnes’ opposition to IAG’s deficiency action, stating in pertinent part that:
All the Bankruptcy Code provides byway of protection for the Burnes is that, notwithstanding their gross breach of every single term of their Plan, they are still entitled to all of the benefits of the Plan. IAG is still precluded from enforcing the terms of the original notes, as those notes have been discharged . . . However, IAG may enforce the Plan itself, and nothing in the Plan limits IAG’s remedy to foreclosure on the collateral. It may collect on the deficiency following foreclosure, calculated according to the amounts owed under the Plan.
Therefore, the only issues on assessment of damages will be whether IAG has included in the calculation some term or item that is not provided for in the Plan (or in the mortgage that the Plan incorporated by reference) or whether there are any arithmetic or computational errors in IAG’s calculation.
Shortly thereafter IAG filed the present motion seeking an assessment of damages totaling $872,214.93.[4] The record contains an affidavit signed by Charles D. Vickery, Manager of Mortgage Lending USALLIANCE Federal Credit Union, detailing the arithmetic formula IAG used to calculate damages. IAG’s calculations under the Plan are:
(1) Cash for $360,000 at 7% interest: $22,852.24
(2) $250,000 Note at 7% interest: $287,027.60
(3)$300,000 Note at 8% interest: $443,861.00
(4) $90,000 Note at 7% interest: $5,713.06
(5) Unsecured claim $55,637 at 20% interest: $11,127.40
(6) Pre-foreclosure real estate taxes (paid): $62,505.43
(7) Foreclosure stamps: $2,280.00
(8) Auctioneer: $5,412.00
(9) Legal (fees for Land, Appellate and Superior court actions): $31,436.20
DISCUSSION
A confirmed plan of reorganization acts to discharge the debtor’s pre-confirmation debts as well as restructure the claims of creditors, see In Re Space Building Corp., 206 B.R. 269, 273 (D.Mass. 1996), who are the prime beneficiaries of any reorganization plan. See In Re Bjolmes Realty Trust, 134 B.R. 1000, 1011 (Bkrtcy.D.Mass. 1991); see also Matter of Boston and Maine Corp., 46 B.R. 983, 986 (D.Mass. 1984) (“bank-' ruptcy reorganization proceedings . . . are primarily for the benefit of creditors”), modified in part by 778 F.2d 890. The Plan is therefore a binding contract between the debtor and its creditor, and is subject to interpretation by the Court according to relevant contract law principles. See In Re Sergi, 233 B.R. 586, 589 (B.A.P. 1st Cir. 1999); Salmon v. Laser Plot, Inc. 189 B.R. 559, 561 (D.Mass. 1995); Bilenski v. Westfield Savings Bank, 313 Mass. 517, 581 (1943).
Neither IAG nor the Burnes dispute the court’s previous finding that the Plan incorporates by reference the terms of the Mortgage. Their agreement reflects the general rule that “where one contract refers to and incorporates the provisions of another, both shall be construed together." Waters Corp. v. Millipore Corp., 2 F.Sup.2d 66, 68 (D.Mass. 1997). What the parties do dispute, however, is whether the terms of the mortgage securing the Plan’s $1,000,000.00 secured claim incorporates the original note’s default provisions allowing for recovery of IAG’s foreclosure costs. According to IAG, the note’s remedial provisions remain viable despite the Burnes’ discharge from debt since the Plan’s express language allows it to retain the mortgage, now on the secured claim, which in turn secured “the performance of [the Burnes’] covenants and agreements” under the note. The Burnes’ position is that the Court is precluded from looking at the note to award attorneys fees because (1) the Plan is the parties’ final agreement, and it is silent on IAG’s ability to collect legal fees and costs related to foreclosure; and (2) the note’s covenants and agreements, like the note’s debt, have been discharged and are therefore no longer binding upon them.
*435 I. WHETHER THE TERMS OF THE REORGANIZATION PLAN INCLUDE THE TERMS OF THE NOTE ALLOWING RECOVERY OF ATTORNEYS FEES RELATED TO FORECLOSURE
Thus, the first issue before the Court is whether the Plan, which includes the terras of the mortgage, also includes the terms of the note. A mortgage on real estate transfers title from the mortgagor to the mortgagee, but the payment of the mortgage note, or the performance of any other condition that is expressed in the mortgage, terminates the interests of the mortgagee and revests the legal title in the mortgagor. See Cooperstein v. Bogas, 317 Mass. 341, 344 (1944); see also Pineo v. White, 320 Mass. 487, 489 (1946); Natick v. Five Cents Savings Bank v. Bailey, 307 Mass. 500, 501 (1940). A mortgage is only incidental to the debt which it secures, Cooperstein at 343, Geffen v. Paltz, 312 Mass. 48, 53-54 (1942), and a mortgagor’s primary obligations are the terms of the note. Natick, 307 Mass, at 501. Hence, the properly right held by a mortgagee cannot be separated from the note and applied independently. Cooperstein, 317 Mass. at 343. Instead, both instruments must be construed together. See Baker v. James, 280 Mass. 43, 47 (1932) (note, mortgage and trust instrument must be read and construed together to ascertain the contract made by parties); see also Hallet v. Moore, 282 Mass. 380, 385 (1933) (for a mortgage to be a workable instrument, it must be construed as a whole and due weight must be attributed to all its parts).
Courts have consistently declined to interpret a mortgage as a document separate from the note which secures it. In Strong v. Jackson, 123 Mass. 60, 64 (1877), it was held that when a note “purports upon its face to be a mortgage note . . . the note and the mortgage are to be construed together in determining the rights of the holder of the note.” Likewise, in Charlestown Five Cents Savings Bank v. Zeff, 275 Mass. 408, 411 (1931), the court found that a note, guaranty, and mortgage executed contemporaneously must be construed together, reasoning in pertinent part:
The note purported on its face to be a mortgage note. The reference to the mortgage, which formed a part of the single transaction, incorporated into the note the terms and conditions of the mortgage. “It has been settled in this Commonwealth, that any memorandum annexed to a note of hand is part of such note, and enters into the construction of the contract, and controls or explains it.”
(Citations omitted.) See also In Re Moran, 163 B.R. 11 (D.Mass. 1994) (note and mortgage executed on same day must be read together); Bielanski, 313 Mass. at 581 (there could be no valid extension of the maturity of the note without its resulting in an extension in the mortgage); Phelps v. Lowell Institution for Savings, 198 Mass. 179, 181 (1908) (performance of an agreement referenced in terms of a mortgage becomes a condition of the mortgage); Jewett v. Tucker, 139 Mass. 566, 575 (1885) (note and mortgage must be construed together). Similarly, in Cooperstein, 317 Mass. at 344, the court clarified that a creditor who is unable to reach the interest of the debtor in a note secured by a mortgage, cannot reach and apply the debtor’s property through the mortgage itself. In this case, the terms of the mortgage referenced the note, which in turn referenced the mortgage. Additionally, both documents were executed on the same day. Thus, the overwhelmingly weight of authority supports a finding that the terms of the Plan, which also incorporate by reference the terms of the mortgage, additionally incorporate the terms of the note.
II. WHETHER THE NOTE’S AGREEMENTS AND COVENANTS REMAIN VIABLE DESPITE DISCHARGE OF NOTE’S UNDERLYING DEBT
The next issue is whether the note’s covenants and agreements remain binding upon the Bumes, even though the debt arising under those notes has been discharged with the confirmation of the reorganization plan. After approval of a Chapter 11 plan, a creditor can enforce only those pre-confirmation claims found in the confirmed plan, and only in the manner and amount specified by the plan. In re Conston, Inc., 181 B.R. 769, 772-73 (1995). Stated differently, the original debt is extinguished and a new debt is put in its place. Id. Thus, although unenforceable in their preconfirmation form against the debtor, discharged debts, and their attendant duties, obligations and liabilities remain viable post-confirmation. Id.: see also Wagner v. United States, 573 F.2d 447, 453 (7th Cir. 1978) (“discharge does not cancel the obligation; the obligation still exists. A discharge merely disables the creditor from enforcing its claim”).
Accordingly, creditors can recover legal fees when provided for by a contract, even when the underlying debt has been discharged. In In re Sure-Snap Corp., 983 F.2d 1015(11th Cir. 1993), the court held that an attorneys fee provision embodied in a mortgage agreement permitted a creditor bank to recoup fees incurred to enforce a mortgage and defend the mortgage’s validity on appeal post confirmation. Like the Bumes, the debtors in Sure-Snap argued unsuccessfully that the attorneys fees provisions in the mortgage agreement were no longer in force since the agreement was terminated by the confirmation plan. Id. at 1018. In rejecting the argument, the court made clear that “confirmation of [debtor’s] Chapter 11 plan did not terminate the agreement, rather, confirmation prevented [creditor] from enforcing the terms of the Agreement against [debtor] to collect pre-confirmation debt.” Id. Because the attorneys fees sought by the creditor were post confirmation, the debtor was not absolved of liability. Id.; see also Curits Mfg. Co. Inc. v. Plasti-Clip Corp., 888 F.Sup. 1212, 1213(D.N.H. 1994) (reorganization does not absolve debtor from tort lia *436 bilily incurred due to post confirmation activities). Likewise, in Siegel v. Federal Home Loan Mortgage Corp., 143 F.3d 525, 531 (9th Cir. 1998), a deed of trust provision allowing a mortgagee to recover attorneys fees incurred in pursuing its rights under the deed was held not to have been extinguished by the mortgagor’s discharge, since “a discharge in bankruptcy does not end a party’s obligation, but merely prevents one method of collection.”
Although the note’s attorneys fees provisions may have fallen dormant, they were not extinguished by the Bumes’ discharge in bankruptcy. Siegel, 143 F.3d. at 531. Instead, they remained as long as the attorneys fee debt arose post-confirmation. Id. Here, there is no question that the debt incurred by IAG for foreclosure arose post-confirmation; after all, it was the Bumes’ failure to abide by the Plan that led directly to LAG’S legal costs. Moreover, a portion of the attorney fees IAG seeks were incurred by IAG in defending a post-confirmation appeal initiated by the Burnes, who had voluntarily continued to litigate the validity of the foreclosure after confirmation of its Chapter 11 plan. See Sure-Snap, 983 F.2d at 1018 (by choosing to appeal the validity of a mortgage agreement allowing creditor to recover attorneys fees related to court proceedings, debtor “did so at the risk of incurring post confirmation costs involved in its acts”); see also Siegel, 143 F.3d at 533 (debtor’s decision to sue mortgagee under deeds of trust post discharge made debtor subject to the deed’s attorneys fees provisions; “debtor chose to return to the fray and to use the contract as a weapon. It is perfectly just, and within the purposes of bankruptcy, to allow the same weapon to be used against him”). Therefore, because the plan was intended only to protect the Bumes from the continuing costs of their pre-confirmation acts, and was not intended to insulate them from costs for post-confirmation acts, Curtis, 888 F.Sup. at 1218, LAG is entitled to recover legal fees incurred as a consequence of foreclosure.
Before awarding attorneys fees, the judge must examine any affidavits and other documentation to determine “the fair market rate for the time reasonably spent preparing and litigating . . . and the fair rate of the attorney’s service." Stowe v. Bologna, 417 Mass. 199, 203 (1994); see also Wornat Development Corp. v. Valkalis, 403 Mass. 340, 349 (1988) (award of attorneys fees based on stipulation in promissory note must be reasonable); see also Kascouris v. Loukas, 333 Mass. 44, 50 ( 1955) (attorneys fee award as provided by mortgage for foreclosure must be reasonable). IAG has filed only an affidavit of the USALLIANCE Federal Credit Union’s manager testifying that IAG spent $31,436.20 on legal fees. Without further documentation, it would be premature for the court to calculate the reasonable amount IAG is entitled to recover for legal fees related to foreclosure, as part of its motion to assess damages.
ORDER
For the foregoing reasons, the Court ALLOWS IAG’s motion for an assessment of damages including the attorneys fees related to foreclosure. Furthermore, LAG is ORDERED to file appropriate documentation with the Court to aide it in its final assessment of damages.

 In December 1994, NCUA assigned its interest to the IAG Federal Credit Union (“IAG”). On April 13, 2000, LAG'S motion to change its name to USAlliance Federal Credit Union was granted. For simplicity, however, this Memorandum will continue to refer to the plaintiff as IAG.

 The two notes were to be guaranteed up to $495,000 by the Farmers Home Administration.

 That decision was ultimately appealed and affirmed by the Appeals Court on October 14, 1998.

 As of September 18, 2000.